**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| IN RE: **Van R. Irion, BPR # 024519** | ) | <u>**FILED UNDER SEAL**</u> |
| 800 S. Gay St., Ste. 700 | ) | |
| Knoxville, TN 37929 | ) | Case No. 1:24-dm-7 |
| | ) | |
| | ) | Chief District Judge |
| | ) | Travis R. McDonough |
| | ) | |
| | ) | Chief Magistrate Judge |
| | ) | Christopher H. Steger |
| | ) | |

---

## MEMORANDUM OPINION AND ORDER

---

This Order is the result of a protracted disciplinary inquiry into the actions of attorney Van Irion ("Respondent"), particularly his conduct in two prior cases. As explained herein, Respondent has intentionally misled not only this Court, but also the Court of Appeals for the Sixth Circuit, and he has engaged in conduct falling short of applicable minimum competency standards. Additionally, throughout this disciplinary proceeding, Respondent has busied himself with filings that are difficult to construe as anything other than frivolous attempts to frustrate the resolution of the misconduct allegations against him. The Court will **FIND** by clear and convincing evidence that Respondent violated the Rules of Professional Conduct as adopted by the Supreme Court of Tennessee and as applied by this Court through Local Rules 83.6 and 83.7.

### I.      LAW AND PROCEDURE

"Justice Cardozo once observed [that] [m]embership in the bar is a privilege burdened with conditions. An attorney is received into that ancient fellowship for something more than private gain. He becomes an officer of the court, and, like the court itself, an instrument or

1

agency to advance the ends of justice." *See In re Snyder*, 472 U.S. 634, 644 (1985) (internal quotations omitted) (quoting *People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 470–471, 162 N.E. 487, 489 (1928)). An attorney bears such a burden because she also wields significant power as an officer of the court. *See id.* But an attorney wields this power subject to the court's supervision. *See Ex parte Garland*, 71 U.S. 333, 378 (1866) ("From [an] entry [of admission] the parties become officers of the court, and are responsible to it for professional misconduct."). A court must require "members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice." *See Snyder*, 472 U.S. at 644–45. "[C]onduct contrary to professional standards [] shows an unfitness to discharge continuing obligations to clients or the courts," and it is "inimical to the administration of justice." *Id.* at 645. Accordingly, "[c]ourts have long recognized an inherent authority to suspend or disbar lawyers." *Id.* at 643 (citations omitted).

Chief Justice John Marshall cautioned that a court must exercise this disciplinary authority "with great moderation and judgment," as it impacts an attorney's ability to practice and earn a living. *See Ex parte Burr*, 22 U.S. 529, 530 (1824). The right to practice cannot "be lightly or capriciously taken." *Id.* Therefore, a court must afford due process to attorneys charged with misconduct. *See Garland*, 71 U.S. at 378 (explaining that attorneys can only be disciplined "for misconduct ascertained and declared by the judgment of the court after opportunity to be heard has been afforded"); *In re Cook*, 551 F.3d 542, 549 (6th Cir. 2009) (explaining that an "attorney facing disbarment" is entitled to procedural due process) (quoting *Theard v. United States*, 354 U.S. 278, 282 (1957)).

"Attorney disciplinary proceedings are not civil actions and not criminal prosecutions." *In re Moncier*, 550 F. Supp. 2d 768, 772 (E.D. Tenn. 2008), *aff'd sub nom. In re Moncier*, 329 F.

2

App'x 636 (6th Cir. 2009) (citation omitted). A disciplinary proceeding is unique in nature, as "it is an investigation into the lawyer's conduct to determine whether the lawyer may continue to practice a profession that is imbued with the public interest and trust." *See In re Landstreet*, 490 F. App'x 698, 702 (6th Cir. 2012) (citation and internal quotations omitted). Such proceedings are typically categorized as "quasi-criminal." *See Moncier*, 550 F. Supp. 2d at 773; *Cook*, 551 F.3d 549 (explaining that disbarment involves "adversary proceedings of a quasi-criminal nature") (quoting *In re Ruffalo*, 390 U.S. 544, 551 (1968)); *In re Justice*, No. 20-5479, 2021 WL 3808965, at *3 (6th Cir. Aug. 26, 2021) ("We have recognized that attorney discipline proceedings are quasi-criminal . . ."). To meet the requirements of due process in this setting, courts must provide an attorney (1) notice of the charged misconduct and (2) "ample opportunity to show cause" why he should not be subject to discipline. *See Cook*, 551 F.3d at 549; *Landstreet*, 490 F. App'x at 702; *Justice*, 2021 WL 3808965 at *3. In the context of state-court disciplinary proceedings, the Sixth Circuit has established that a court satisfies these requirements when an attorney is "given an opportunity to respond to the allegations set forth in the complaint, testify at length in her own defense, [and to] present other witnesses and evidence to support her version of events." *See In re Squire*, 617 F.3d 461, 467 (6th Cir. 2010) (quoting *Cook*, 551 F.3d at 550) (internal quotation omitted).

The Eastern District of Tennessee has adopted disciplinary procedures in accordance with these due-process requirements. Local Rule 83.6 provides that:

> The minimum standards of professional conduct before this Court include the Rules of Professional Conduct adopted by the Supreme Court of Tennessee insofar as they relate to matters within the jurisdiction of this Court. Such rules are not exhaustive of the ethical standards the Court expects attorneys to meet. The Court has the obligation and responsibility to interpret and apply the RPC and

3

other rules and standards of conduct without being bound by the decisions of Tennessee courts, other courts, or agencies.[1]

Local Rule 83.7(a) further elaborates that "[t]he Court may impose discipline on any member of its bar who has violated the Rules of Professional Conduct as adopted by the Supreme Court of Tennessee, or has engaged in unethical conduct tending to bring the Court or the bar into disrepute." The Court may initiate a disciplinary proceeding addressing such conduct "by the issuance of an order to show cause signed by the Chief Judge." E.D. Tenn. L.R. 83.7(b); *Moncier*, 550 F. Supp. 2d at 774 (explaining that "an action can be initiated by the Chief Judge upon his own initiative"). The Court shall hold a hearing when the attorney under investigation requests it or when the Court determines that a hearing is necessary for the proper disposition of the charges. *See* E.D. Tenn. L.R. 83.7(i).

Violations of "the Rules of Professional Conduct or rule or orders of the Court or the respondent's engagement in unethical conduct tending to bring the Court or the bar into disrepute [must] be proven by clear and convincing evidence." *Id.* Such evidence will "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions [is] 'highly probable.'" *Florida v. Georgia*, 592 U.S. 433, 439 (2021) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

---

[1] "The Court gives considerable weight to the opinions of the Tennessee state courts in regard to the interpretation of the Tennessee Rules of Professional Conduct, but it is ultimately the responsibility of this Court and this Court alone to determine whether the Tennessee Rules of Professional Conduct were violated by Respondent such that he is subject to disciplinary action in this Court." *In re Moncier*, 550 F. Supp. 2d 768, 770 n.2 (E.D. Tenn. 2008), *aff'd sub nom. In re Moncier*, 329 F. App'x 636 (6th Cir. 2009).

4

The Court has applied this standard to all factual findings that follow. These facts establish that the Court cannot place the requisite trust in Respondent's word or the quality of his work. He has clearly demonstrated that the Court cannot depend on him to be "an instrument or agency to advance the ends of justice." *See Snyder*, 472 U.S. at 644.

## II.    FACTUAL BACKGROUND

This matter concerns alleged misconduct by Respondent in two prior cases: (1) *Whiting v. Trew, et al.*, Case No. 3:20-cv-54 (hereinafter "3:20-cv-54" or "*Trew*") and (2) *Whiting v. City of Athens, et al.*, Case No. 3:23-cv-2 (hereinafter "3:23-cv-2" or "*Athens*"). The Court will review the relevant facts from both cases before proceeding to the procedural history of the instant disciplinary action.

### A.    The *Trew* Litigation

#### i.    *The Relevant Claims*

Respondent, on behalf of Glenn Whiting and ARD Properties[2] (hereinafter "ARD"), filed the complaint initiating *Trew* on February 6, 2020. (*See* Doc. 1 in 3:20-cv-54.) ARD was a "common-law irrevocable trust, created for the purpose of holding commercial real estate." (Doc. 178, at 2 in Case No. 3:20-cv-54.) Respondent was the sole lawyer for both plaintiffs. (*See* Doc. 1, at 19 in Case No. 3:20-cv-54.)

The conflict in *Trew* centered "around a property at 213 Pope Avenue, Athens, Tennessee." (Doc. 178, at 1 in Case No. 3:20-cv-54.) Pursuant to 42 U.S.C. § 1983, Whiting

_____

[2] The legal name for ARD Properties is "ARD Property Management." (*See* Doc. 119 in Case No. 3:20-cv-54.) The plaintiffs did not use ARD's correct name for nearly a year and a half after filing the complaint. (*See id.*)

5

and ARD alleged that an employee for the City of Athens, Tennessee (hereinafter "the City"), "signed an order requiring plaintiff ARD Properties to make major repairs to" the Pope Avenue building accompanied by a threat to demolish the building in the absence of such repairs. (*See* Doc. 1, at 12 in Case No. 3:20-cv-54.) They alleged that this was retaliation against Whiting for his public criticism of city officials. (*See* Doc. 1, at 3–12 in Case No. 3:20-cv-54.) Whiting and ARD sought actual and punitive damages in addition to other relief.[3] (*See id.* at 17–18.)

### ii. Discovery and Damages

The damages associated with the Pope Avenue building became a contentious aspect of the case due to the unclear nature of Whiting's relationship with ARD. Donald and Carol Ammerman purchased the Pope Avenue property in December 2003 and conveyed it to ARD in January 2004. (*See* Doc. 178, at 2 in Case No. 3:20-cv-54.) ARD was still the record owner of the Pope Avenue property at the time of the suit. (*See id.*) Whiting and ARD initially alleged that Whiting was an "executor" of ARD. (Doc. 1, at 2 in Case No. 3:20-cv-54.)

The parties to the suit began to contest what this meant when Whiting refused to answer deposition questions seeking information about ARD. (*See* Doc. 34-3, at 10 in Case No. 3:20-cv-54; *see generally* Doc. 33; Doc. 34 in Case No. 3:20-cv-54.) Whiting "pled the Fifth" when asked about his relationship with ARD and "refused to answer any questions about his sources of income, the trustees of ARD Properties . . . and his association with the ARD Properties trust . . . ." (*See* Doc. 41, at 6; Doc. 34-4 in Case No. 3:20-cv-54.) Respondent moved for a protective order to prevent the defendants from discovering such information from the plaintiffs. (*See* Doc.

---

[3] The plaintiffs later amended the complaint to also allege that the defendants deprived them of due process. (*See* Doc. 56, at 21.)

6

33 in Case No. 3:20-cv-54.) In response, the defendants asserted that discovery concerning ownership of the Pope Avenue property was relevant to the question of damages because the plaintiffs were "blaming the Defendants for their inability to complete repairs" and the defendants could "defend this allegation by arguing that the Plaintiffs lack the capital to perform the referenced repairs." (Doc. 41, at 6 in Case No. 3:20-cv-54.) On November 3, 2020, Magistrate Judge Debra Poplin denied Respondent's motion for a protective order and found that Whiting's relationship to ARD was relevant to the suit because if he had "no ownership interests in any of the real property at issue, he may [have] lack[ed] standing to pursue the [] lawsuit individually." (Doc. 44, at 19 in Case No. 3:20-cv-54.)

Roughly two months later—after Respondent filed an amended complaint (Doc. 56 in Case No. 3:20-cv-54)—Respondent filed another motion for a protective order (Doc. 61 in Case No. 3:20-cv-54), and the defendants filed a motion to compel (Doc. 65 in Case No. 3:20-cv-54). Again, Respondent asserted that the information concerning the plaintiffs' finances was not relevant to the case, particularly since Whiting had disclaimed any damages "related to lost rental income from any building." (*See* Doc. 61, at 1 in Case No. 3:20-cv-54.) By contrast, the defendants argued that the plaintiffs' income remained relevant because it affected their ability to make repairs to the Pope Avenue building. (*See* Doc. 65, at 11 in Case No. 3:20-cv-54.) The defendants also argued that Whiting's relationship with ARD remained relevant because, if he had no ownership interest in the properties at issue, "he may lack standing to pursue the lawsuit individually." (*Id.* at 13.) In response, Respondent submitted the following on behalf of the plaintiffs:

> The Pope [Avenue] building is owned by ARD Properties. The defendants already have documents that verify this fact. The only outstanding questions are what

7

connection does Mr. Whiting have with ARD Properties, and were the defendants aware of said connection at the time they took their adverse actions against ARD.

ARD Properties is a trust that is controlled by the Whiting and Ammerman families. *Connie Ammerman, Glenn Whiting's wife, is a trustee for ARD Properties.* Defendants already have documents reflecting this fact. *Mr. Whiting is a beneficiary of the ARD Properties trust. Plaintiffs must, and will, provide evidence supporting this fact. Production of this evidence has been withheld pending this Court's ruling on the instant motion and cross motion.* Beyond establishing this one fact, no further documentation regarding the activities of ARD nor its trustees or other beneficiaries is remotely relevant to this lawsuit.[4][5]

(Doc. 78, at 5–6 in Case No. 3:20-cv-54 (emphasis added).)

### iii. The Defendants' Motion for Summary Judgment

While these discovery disputes progressed, the defendants raised similar arguments in their motion for summary judgment filed on March 29, 2021. (*See* Doc. 84.) Relying on the language of the documents that created ARD, the defendants asserted that:

Plaintiff Glenn Whiting is not a trustee of ARD Property Management. At all times relevant, the sole trustees of ARD Property Management were Donald R. Ammerman and his daughter, Connie Ammerman. Neither trustee authorized the filing of the instant lawsuit. ARD Property Management is the recorded owner of the Pope Avenue Property.

---

[4] This was Respondent's first representation on the record in *Trew* that Whiting was a beneficiary—one year into the litigation. Respondent did not allege that Whiting was a beneficiary of ARD in the complaint or amended complaints. (*See* Docs. 1, 56, 159 in Case No. 3:20-cv-54.) It took another six months for Respondent to first assert that Whiting was a trustee. (*See* Doc. 147, at 14–15 in Case No. 3:20-cv-54.)

[5] In the order disposing of the motion for a protective order and the motion to compel, Magistrate Judge Poplin stated that "[i]t is entirely unclear . . . why Plaintiffs have withheld such evidence in this case, but the Court admonishes Plaintiffs that the withholding of any relevant evidence may lead to sanctions pursuant to Rule 37." (*See* Doc. 112, at 30 n.11 in Case no. 3:20-cv-54.)

8

(Doc. 85, at 4–5 in Case No. 3:20-cv-54 (internal citations and footnotes omitted).)  The

defendants argued that, because "Whiting had no legal interest in the Pope Avenue Property," he

could not "show a concrete harm."  (*Id.* at 29.)  They also argued that "[a]ny financial damages

as a result of the condemnation are the property interest of the trust," for which Whiting was not

a trustee.[6]  (*See id.*)

On April 26, 2021, almost a month after the defendants filed the motion for summary

judgment, Respondent emailed a draft declaration to Whiting, in which Whiting would have

averred that he had been "a *beneficiary* of ARD Properties since the trust was created."[7]  (*See*

Doc. 98-1, at 2, 5 (emphasis added).)  The draft said nothing of Whiting being a *trustee*.  (*See id.*

at 4–6.)  This declaration was not filed at the time,[8] and Respondent has offered no evidence that

he communicated with Whiting about it again until September 20, 2021, the same day he

eventually filed his opposition to the motion for summary judgment.  (*See* Doc. 147 in Case No.

3:20-cv-54; Doc. 98-4.)

---

[6] Although the relationship between these issues has been confused at times, Whiting's standing
to bring a First Amendment retaliation claim and his ability to recover compensatory damages
were distinct.  The discussion at the final pretrial conference effectively outlines the difference
between the two.  (*See* Doc. 93.)  Whiting could pursue nominal damages on his own behalf,
meaning he had standing to bring his First Amendment retaliation claims, but he could only
recover compensatory damages to the Pope Avenue building as the trustee or beneficiary of
ARD.

[7] The draft also called for Whiting to aver that he had served as "manager" of the Pope Avenue
building.  (*See* Doc. 98-1, at 5.)

[8] Outside Connie Ammerman's declaration that Respondent filed and drafted (*see* Doc. 149, at
63–64 in Case No. 3:20-cv-54; Doc. 98-2), Respondent never produced any evidence that
Whiting was a beneficiary.  This is notable, considering that Respondent represented that he had
such evidence and would produce it.  (*See* Doc. 78, at 5–6 in Case No. 3:20-cv-54.)

9

On July 19, 2021, roughly four months after the defendants moved for summary judgment and nearly a year and a half into the suit, the plaintiffs filed a motion to correct ARD's name on the complaint. (*See* Doc. 119 in Case No. 3:20-cv-54.) The plaintiffs had incorrectly designated ARD as "ARD Properties" even though its name was "ARD Property Management." (*See id.* at 1.) Respondent did not notice this until the defendants used the correct name in their motion for summary judgment.[9] (*See id.*) The defendants opposed the plaintiffs' motion because, they argued, the plaintiffs "were in possession of the documents allegedly creating the trust ARD Property Management as early as April of 2020 when they were produced to Defendants, five months before the deadline for amendment of pleadings contained within the original scheduling order." (*See* Doc. 124, at 8 in Case No. 3:20-cv-54.) The Court ultimately granted the plaintiffs' motion (*see* Doc. 158 in Case No. 3:20-cv-54), and they filed a second amended complaint.[10] (*See* Doc. 159 in Case No. 3:20-cv-54.)

On September 20, 2021, at 11:56 PM, Respondent filed the plaintiffs' response in opposition to the defendants' motion for summary judgment. (*See* Doc. 147 in Case No. 3:20-cv-54.) For the very first time, Respondent represented to the Court:

> Glenn Whiting has been a *trustee* of ARD Property Management since 2015. The trust documents disclosed to the defendants early in discovery show that when either of the initial trustees dies, Glenn Whiting immediately becomes the substitute *trustee*. This happened in 2015.

---

[9] ARD's legal name is listed in bold on the first page of the documents creating the trust. (*See* Doc. 86, at 186 in Case No. 3:20-cv-54.)

[10] Again, Respondent only alleged that Whiting was an "executor" for ARD. (*See* Doc. 159, at 2 in Case No. 3:20-cv-54.) The term "executor" does not even appear in the trust documents. (*See* Doc. 86, at 186–95 in Case No. 3:20-cv-54.)

10

(Doc. 147, at 14–15 in Case No. 3:20-cv-54 (citations omitted) (emphasis added).) Respondent then boldly stated:

> To summarize the defendants' position, they admit that ARD has been harmed sufficiently to deter an ordinary person; and that Whiting participated in protected speech; but that Whiting hasn't been harmed because he is not a trustee of ARD, and ARD did not participate in protected speech. *Yet, because Whiting has been a trustee since 2015 (and the defendants would have known that had they reviewed the Trust documents)* both of defendants' arguments fail.[11] [12]

(*Id.* at 15 (emphasis added).)

Earlier that same day, at 2:57 PM, Respondent emailed Whiting a draft declaration calling for Whiting to aver that he had "served as a *trustee* for ARD Property Management since the death of [his] mother-in-law in 2015." (*See* Doc. 98-4, at 2, 5 (emphasis added).) The declaration also called for Whiting to aver that "[a]s a trustee of ARD Property Management, I have authorized all legal work performed on this litigation and all documents filed on behalf of ARD." (*See id.* at 5.) Whiting signed the declaration, and Respondent filed it the next day as a supplement to the response in opposition to the motion for summary judgment. (*See* Doc. 149, at 1–2 in Case No. 3:20-cv-54.) According to Respondent's deposition testimony, his efforts to verify Whiting's trustee status consisted of reading only a

---

[11] Respondent made this assertion after Magistrate Judge Debra Poplin explained that "[i]n Defendants' motion for Summary Judgment, the legal documents for ARD Property Management show that Plaintiff Glenn Whiting is not a trustee of that entity" when disposing of the plaintiffs' motion for a protective order (Doc. 61 in Case No. 3:20-cv-54) and the defendants' motion to compel (Doc. 65 in Case No. 3:20-cv-54). (*See* Doc. 112 at 30 in Case No. 3:20-cv-54.)

[12] Throughout the present disciplinary matter, Respondent has asserted that neither Whiting nor Respondent reviewed the trust documents thoroughly after the Court's ruling on the motion for summary judgment in *Trew*. (*See* Doc. 7, at 7; Doc. 34, at 6–7; Doc. 41, at 8.) Yet, in opposing that same motion, Respondent proudly laid claim to exactly such a meaningful review of the same documents.

11

portion of the page describing Whiting's relationship with ARD.[13]  There is no persuasive

evidence Respondent took any other meaningful action to confirm his representation that

Whiting was a trustee.

The Court denied the defendants' motion for summary judgment on Whiting's First

Amendment retaliation claim.  In doing so, it found:

> Where a trust owns property, the trustee holds legal title and, in that sense, owns
> the property, holding it for the benefit of the beneficiary who owns the equitable
> title.  The trust documents name Whiting as a potential successor trustee in the
> event of the death of original trustees Donald or Carol Ammerman.  Carol
> Ammerman passed away in 2015.  Whiting averred that he has served as a trustee
> for ARD Properties since that time.  Connie Ammerman also averred that Whiting
> is, and was at all time[s] relevant to his claims, a beneficiary of the Trust.
> Because Whiting has shown a factual dispute as to whether he held legal title to
> the Pope Avenue building as a trustee, he has satisfied his burden to show
> standing at this stage in the litigation[.]

(Doc. 178, at 20–21 in Case No. 3:20-cv-54 (cleaned up) (citations and internal quotations

omitted).)  The Court also explained that:

> Even if Whiting was not a trustee of the Pope Avenue property, he can still
> establish standing because the chilling effect on Whiting's exercise of his
> constitutional rights is, itself, an injury sufficient to confer standing as long as it is
> "distinct and palpable."  Surely, when an individual's close family members hold
> ownership interests in a structure, and that structure is condemned in retaliation
> for his exercise of constitutional rights, the chilling-effect injury is concrete and
> palpable—the government did not merely threaten abstract hypothetical action,
> but took clear action injuring the family members' ownership interests.
> Therefore, the chilling effect in this case is a sufficiently concrete injury to confer

---

[13] In his deposition taken in this disciplinary proceeding, Respondent vaguely stated that he went
through the trust documents (*see* Doc. 110, at 50), but that he did not "read through all of the
trust documents."  (*See id.* at 60.)  He expounded that his "client told [Respondent] that he was a
trustee and that was good enough."  (*Id.*)  He also stated that it was Whiting who showed him the
page that said "[w]hen these people die, I'm a trustee."  (*Id.*)  However, the page Respondent is
referring to also describes the prerequisites associated with Whiting's assumption of a trustee
role.  (*See* Doc. 86, at 189 in Case No. 3:20-cv-54.)  Respondent later explained that he read
certain portions of the page, but not all of it.  (*See* Doc. 110, at 76–77.)

standing as to Whiting's claims. To find otherwise would create the absurd result that if the government would like to retaliate without legal consequence against an individual for exercising his constitutional rights, it can do so simply by injuring the individual's close family and loved ones, rather than the individual himself.[14]

(*Id.* at 21–22 (citations omitted).) The Court granted summary judgment to the defendants on ARD's First Amendment claims because there was no evidence that ARD "itself, rather than Whiting[,] engaged in any protected activity." (*Id.* at 18–19.) Thus, Whiting remained a party to the suit, and ARD did not.[15] (*Id.* at 26.) While the Court's order resolved the issue of Whiting's standing to bring suit, it did not resolve Whiting's ability to recover compensatory damages for the repairs to the Pope Avenue building.

### iv. *Pretrial Rulings*

The defendants filed a motion in limine seeking to exclude any reference or evidence of Whiting's status as a trustee for ARD because "Whiting [was] not a trustee based upon the operative trust documents produced." (*See* Doc. 169, at 2–3 in Case No. 3:20-cv-54.) The defendants explained that:

Although Whiting [was] identified as a potential successor trustee, his appointment [was] not automatic. Rather the trust documents indicate that upon the death of a trustee, the Trust has the option to either fill the vacancy so created, or reduce the number of Trustees. The appointment of a new trustee further required a special meeting with appropriate minutes signed by all trustees.

There is no evidence that such a meeting ever occurred and despite discovery requests Plaintiffs have not provided any evidence supporting that Whiting was

---

[14] While this holding meant that Whiting retained standing to pursue his First Amendment claims regardless of his legal relationship to ARD (*i.e.*, to at least recover nominal damages), it did not mean he could recover compensatory damages related to the Pope Avenue building without showing he was a beneficiary or trustee. (*See supra* Note 6.)

[15] The Court's order also left the City of Athens as the only remaining defendant. (*See* Doc. 178, at 13 in Case No. 3:20-cv-54.)

ever made a trustee.  The two actual trustees of ARD Property Management deposed, Connie Ammerman and Donald Ammerman, both denied that Glenn Whiting was ever a trustee.

(*Id.* at 3 (internal emphasis, quotations, and citations omitted).)

The Court heard further argument on the motion at the final pretrial conference held on December 28, 2021.  (*See* Doc. 182 in Case No. 3:20-cv-54.)  Counsel for the City of Athens argued that the Court should exclude any evidence of damages because the alleged damages to the Pope Avenue building belonged to ARD and Whiting could not recover those damages if he held no legal relationship with the trust.  (*See* Doc. 93, at 6–7.)  Essentially, he argued that the only party with standing to recover compensatory damages associated with the Pope Avenue property—ARD—was dismissed at summary judgment.  (*See id.* at 12, 15.)  He stressed that the trust documents did not name Whiting as a trustee or beneficiary.  (*See id.* at 16–17, 23–24.)  In response, Respondent represented that Whiting was both a beneficiary and a trustee of ARD, meaning his damages were the same as ARD's.  (*See id.* at 7, 9.)  When the Court asked Respondent to describe Whiting's relationship to ARD, Respondent stated, "Well, *he is a beneficiary*, and *he is a trustee*."  (*Id.* at 17 (emphasis added).)

The Court denied the defendants' motion in limine.  (*See* Doc. 184, at 3–4 in Case No. 3:20-cv-54.)  In doing so, it highlighted that the trust documents identified Whiting as a potential successor trustee (*id.* at 3), that Whiting averred he was a trustee (*id.* at 4),[16] and that ARD

_____

[16] The Court was, of course, unaware that Respondent first sent Whiting the declaration in which he claimed, for the first time, to be a trustee on the same day he signed it.  (*See* Doc. 98-4; Doc. 149, at 1–2 in Case No. 3:20-cv-54; Doc. 184, at 4 in Case No. 3:20-cv-54.)  The Court was also unaware that there was no other evidence of meaningful conversations between the two on this topic.

14

trustee Connie Ammerman averred that Whiting was a beneficiary (*id.*).[17]  It explained that:

> [J]ust because no minutes or documents were produced demonstrating that Whiting was appointed as a trustee does not mean that such an appointment did not, in fact, happen.  There is an issue of fact as to whether the Board of Trustees allowed for Whiting's pre-acceptance as a successor trustee under the terms of the trust instrument, in which case, Whiting would have automatically become a trustee upon notification of Carol Ammerman's death, consistent with his averments.

(*Id.*)  Thus, the Court's acceptance of Respondent's representations that Whiting was a beneficiary and trustee resulted in the issue being presented to the jury.

### v.  Trial

The case proceeded to trial.  "Whiting's only theory for compensatory damages at trial rested on the alleged increased cost of necessary additional repairs to the Pope Avenue Building after the City's order of condemnation, which prevented him, at least in practicality, from repairing the building."  (Doc. 227, at 2 in Case No. 3:20-cv-54.)  On the first day of trial, Whiting testified that he paid half the purchase price for the Pope Avenue property and that:

> Although my name was not on the trust, my wife was, and it was on the original trust that said that when my mother-in-law or father-in-law died, I took their position on that trust.  And so -- and she passed away quite a few years ago, I guess about seven -- seven years ago, and so my name original- -- you know, I just took over the trust at that point . . . .

(Doc. 202, at 29–32 in Case No. 3:20-cv-54.)  However, Whiting's testimony soon changed.  On cross-examination, he testified that ARD never took any "formal action" to make him a trustee. (*Id.* at 120.)  Counsel for the City then offered ARD's trust documents into evidence, and, after

_____

[17] The Court referred to the July 13, 2021 declaration that Respondent drafted for Connie Ammerman and later filed on September 21, 2021, as a supplement to the plaintiffs' response to the defendants' motion for summary judgment.  (*See* Doc. 98-2; Doc. 149 in Case No. 3:20-cv-54; Doc. 184, at 4 in Case No. 3:20-cv-54.)

reviewing them on the witness stand, Whiting admitted that the documents in fact did not identify him as a trustee. (*See id.* at 133–34.) Whiting had believed his appointment as trustee was automatic following the death of his mother-in-law, Carol Ammerman, but testified that he had never read the trust documents until that very moment at trial. (*See id.*)

Nevertheless, Respondent persisted in arguing that Whiting was a beneficiary and a trustee. On the second day of trial in discussions outside the presence of the jury, the Court asked Respondent if he had any evidence that Whiting was a beneficiary of ARD. (Doc. 94, at 7.) Respondent stated that Connie Ammerman, Whiting's wife and ARD trustee, was going to testify that Whiting was a beneficiary. (*Id.*) The Court then observed that "I thought you had focused on the theory that [Whiting] was a trustee and that's why he can seek damages, not that he's a beneficiary and therefore he can seek damages." (*Id.* at 8.) Respondent answered, "He's both, your Honor." (*Id.*) Respondent also claimed that the plaintiffs had always asserted that Whiting was a beneficiary and trustee.[18] (*Id.* at 9.) Further, he acknowledged that Whiting's status as a beneficiary or trustee was related "to the damages issue."[19] (*Id.*) Respondent asserted:

> He thought he was a trustee. And according to the document, he may not be. And, I mean, I guess, Your Honor, this might boil down to what's the default under the law when a trust is set up and the trust ends up not following -- not doing the details of entering the minutes. I mean, that's really what it boils down

---

[18] This was untrue. Respondent merely alleged that Whiting was an "executor" for ARD in the complaint and amended complaints. (*See* Doc. 1, at 2; Doc. 56, at 2; Doc. 159, at 2 in Case No. 3:20-cv-54.) As noted herein, Respondent's description of Whiting's role evolved as necessary.

[19] In the present disciplinary matter, Respondent has repeatedly asserted that any misrepresentations as to Whiting's relationship with ARD were irrelevant to the *Trew* case (*see* Doc. 7, at 6–7, 9; Doc. 34, at 6–7; Doc. 41, at 8), despite this previous acknowledgment that Whiting's status as a trustee or beneficiary did affect the damages he could recover.

16

to, is, no one entered the minute, "Hey, yeah, when Connie died -- or Carol died, he became the trustee." That's a one-page minute. It's a technicality.

(*Id.* at 10.) The Court corrected Respondent, stating that, "Well, it's not a technicality when your client testified yesterday that he's not a trustee." (*Id.*) After further discussion, Respondent partially conceded that he could not show Whiting was a beneficiary or trustee, stating that he would "like to preserve the argument for appeal," but could not "see an argument that [he could] straight-faced make to the Court" regarding the compensatory-damages theory.[20] (*See id.* at 26–27.)

The Court granted the City's motion for judgment as a matter of law on the issue of compensatory damages after hearing argument from the parties. (*See* Doc. 227 in Case No. 3:20-cv-54.) The Court found that no reasonable jury could find Whiting to be a trustee for ARD, as the "only admissible evidence Whiting ever had that he was a trustee was his own personal assertion that he was a trustee, without any basis in fact or law." (*Id.* at 7.) The Court also found that no reasonable jury could have found that Whiting was a beneficiary, as he "presented no evidence at trial that Donald Ammerman [the settlor] manifested an intention to give him a beneficial interest at the time the trust was created[.]" (*Id.* at 11–12.) Despite Respondent's representations to the contrary, he ultimately failed to present any competent evidence that reasonably suggested Whiting was an ARD beneficiary or trustee after the issue was extensively litigated in discovery, at summary judgment, and at trial.[21]

_____

[20] Respondent did not, however, make any assertions as to Whiting's trustee or beneficiary status on appeal. (*See* Doc. 38 in 6th Cir. Case No. 22-5448; Doc. 50-2, at 1 n.1 in 6th Cir. Case No. 22-5448.)

[21] In Respondent's motion to recuse filed in *Athens* (*see infra* Section II.B.i), Respondent again asserted that ARD's trust documents "stated that Whiting would become a trustee upon the death

17

Despite the uncertainty caused by Respondent's representations regarding Whiting's status with ARD throughout *Trew*, it is clear that, at all times relevant to that litigation, Whiting was neither a beneficiary nor a trustee. (*See* Doc. 227 in Case No. 3:20-cv-54.) Whiting was a *potential successor trustee* to the first trustees—Donald and Carol Ammerman. (*See* Doc. 86, at 189; Doc. 227, at 2 in Case No. 3:20-cv-54.) Although Carol Ammerman died prior to the events at issue in *Trew* (*See* Doc. 227, at 2 in Case No. 3:20-cv-54), Whiting did not automatically succeed Ammerman as trustee upon her death. (*See* Doc. 86, at 189; Doc. 227, at 3 in Case No. 3:20-cv-54.) The relevant page of the trust documents includes the following provisions regarding succession procedures:

> Any such death, resignation or removal from office of any Trustee shall immediately be noted in the Minutes of this REIT, along with the decision of the Board of Trustees of **ARD Property Management** to either fill the vacancy so created, or to reduce the number of Trustees. Should the Board of Trustees of **ARD Property Management** vote to fill such vacancy, the Successor Trustee shall be immediately notified . . . of their conditional appointment to the Board of Trustees of **ARD Property Management** as Trustee. Acceptance of such appointment shall at all times be by Special Meeting called for such purpose and with an appropriate Minute signed by the accepting Trustee. . . .
>
> The Board of Trustees of **ARD Property Management** may, in its discretion, by appropriate Minute, allow for the preacceptance of the position of Trustee by any Successor Trustee. The effect of any such pre-acceptance shall at all times be to make the appointment of such Successor Trustee automatic upon receipt by such Successor Trustee of written notice of the death, resignation, or removal from office of the Trustee they are named to succeed. No further action of the Board of Trustees of **ARD Property Management** shall at any time be necessary to enable such Trustee to exercise full powers of Trustee of **ARD Property Management**. An appropriate Minute, however, shall be made reflecting that such has taken place, as soon thereafter as conveniently possible.

_____

of any of the then-current trustees." (*See* Doc. 91, at 6 in Case No. 3:23-cv-2.) Respondent acknowledged that administrative action was necessary to make Whiting an ARD trustee (*see* Doc. 91, at 6 in Case No. 3:23-cv-2), but this does not rectify the blatant inaccuracy of Respondent's initial statement.

(Doc. 86, at 189 in Case No. 3:20-cv-54 (emphases in original).)  It is unequivocally clear from this plain text that a successor trustee *would not necessarily become a trustee* following the "death, resignation or removal from office" of the person he is nominated to succeed.  (*See id.*) Instead, the two paragraphs above set out two available paths of succession, each of which requires board approval and the satisfaction of specific procedural requirements.  In the first path, following the "death, resignation or removal from office" of the former trustee, the board may decide to "*either* fill the vacancy so created, or to reduce the number of Trustees"; should the board decide to fill the vacancy, that triggers a process beginning with the "conditional appointment" of the successor.  (*Id.* (emphasis added).)  In the second path, the Board may "allow for the preacceptance of the position of Trustee" by a successor, which does "make the appointment of such Successor Trustee automatic upon receipt by such Successor Trustee of written notice of the death, resignation, or removal from office of the Trustee they are named to succeed."  (*Id.*)  Whiting's nomination took neither path—the Board did not opt to fill the vacancy left by Carol Ammerman after her death, and it had not initiated a "preacceptance" of Whiting prior to her death; thus, under the plain text of the trust documents, Whiting never became a trustee.

  **B.**    **The *Athens* Litigation**

     ***i.***    ***The Relevant Claims***

  Respondent filed the complaint initiating *Athens* on January 3, 2023.  (*See* Doc. 1 in Case No. 3:23-cv-2.)  Again, only Respondent represented Whiting, who alleged that various City of Athens employees "intentionally deprived Whiting of his" First Amendment rights at a July 4th

picnic held for city employees.  (*See id.*)  Whiting also brought various state-law claims.[22]  (*See id.* at 11–13.)  On May 5, 2023, Whiting sought leave to amend his complaint.  (Doc. 44 in Case No. 3:23-cv-2.)  Whiting intended to add a new defendant and claims against the existing defendants in the case.  (*See id.*)  Magistrate Judge Poplin denied Whiting's motion, as she found that the new allegations did not arise out of the same occurrence or series of occurrences in accordance with Rule 20(a)(2).  (*See* Doc. 63 in Case No. 3:23-cv-2.)  Whiting objected to this decision (Doc. 69 in Case No. 3:23-cv-2), and the Court overruled his objection.  (*See* Doc. 81 in Case No. 3:23-cv-2.)

Respondent filed two new complaints on Whiting's behalf on June 22, 2023, bringing the claims he intended to add when seeking to amend the complaint in 3:23-cv-2.  (*See* Doc. 1 in 3:23-cv-220; Doc. 1 in 3:23-cv-221.)  These complaints also alleged First Amendment claims against the City and its officials, and Magistrate Judge Debra Poplin found Cases 3:23-cv-2, 3:23-cv-220, and 3:23-cv-221 related for case-assignment purposes.  (*See* Doc. 3 in 3:23-cv-220; Doc. 3 in 3:23-cv-221.)  Accordingly, Magistrate Judge Poplin and the undersigned were assigned to each case pursuant to the Court's Local Rules.  (*See id.*)  Respondent and Whiting took issue with this, and Respondent objected to the case assignments.  (*See* Doc. 9 in Case No. 3:23-cv-220; Doc. 10 in Case No. 3:23-cv-221.)  He argued that it was improper to assign cases on this basis, as he asserted that knowledge of other cases could lead to improper rulings.  (*See* Doc. 9, at 3 in Case No. 3:23-cv-220.)  Respondent also claimed that the undersigned had already improperly considered facts from *Trew* (*see id.* at 4), after the Court noted the following

_____

[22] For a more complete recounting of the facts in *Athens*, see Docs. 211 and 279 in 3:23-cv-2. Here, the Court will include only facts relevant to this proceeding.

when overruling Whiting's objection to Magistrate Judge Poplin's order denying him leave to amend his complaint:

> This Court and its jurors (not to mention some of these same defendants) have been burned before by Whiting's sophistry. *See* Doc. 227, at 7 in Case No. 3:20-cv-54 (summarizing litigation before this Court wherein Whiting, represented by the same counsel as in this case, misrepresented his legal interest in property at issue, resulting in a jury trial on the issue before Whiting finally admitted the mistake on the witness stand). Future attempts to deceive the Court will not be tolerated.

(Doc. 81, at 9 n.6 in Case No. 3:23-cv-2.) The Court offered this observation after it found that Whiting misrepresented the contents of Magistrate Judge Poplin's order denying Whiting leave to amend. (*See id.*) The Court overruled Whiting's objection to the case assignments (*see* Doc. 14 in Case No. 3:23-cv-220; Doc. 11 in Case No. 3:23-cv-221),[23] and Whiting filed a motion to recuse the undersigned in all three cases. (*See* Doc. 91 in 3:23-cv-2; Doc. 15 in 3:23-cv-220; Doc. 12 in 3:23-cv-221.)

In the motions to recuse, Respondent asserted for a second time that the undersigned's reference to his past conduct was improper. (*See, e.g.*, Doc. 91 in Case No. 3:23-cv-2.) The Court denied the motions, explaining that the Court "merely expressed displeasure with Whiting's misleading summary of Magistrate Judge Poplin's order and warned that it would not tolerate future deceptive behavior." (*See, e.g.*, Doc. 103, at 4 in Case No. 3:23-cv-2.) "The Court's reference to Whiting's actions in a prior case was only meant to provide context for its

---

[23] Respondent persisted in raising these arguments regarding the Court's case-assignment procedures in the present disciplinary matter, (*see* Doc. 12, at 20–22), even after the Sixth Circuit held that "a judge is not required to recuse simply because he has presided over another case involving the same party." *Whiting v. City of Athens*, No. 23-6082, 2024 WL 3537651, at *3 (6th Cir. July 25, 2024).

concern that, given his misstatement of Magistrate Judge Poplin's findings, similar behavior may persist in the instant case absent reprimand." (*Id.*) It found that Whiting had not been subject to "deep-seated antagonism warranting recusal."[24] (*Id.* at 5 (cleaned up).)

Respondent subsequently filed a motion for leave to appeal the Court's order denying his motion to recuse. (*See* Doc. 112 in Case No. 3:23-cv-2; Doc. 25 in Case No. 3:23-cv-220; Doc. 26 in 3:23-cv-221.) He reiterated for the third time that the Court considered "facts not properly before it" when overruling his objections to Magistrate Judge Poplin's order. (*See, e.g.*, Doc. 112, at 2–5 in Case No. 3:23-cv-2.) The Court denied the motion, finding that the proposed appeal met none of the statutory requirements for the certification of an interlocutory appeal. (*See* Doc. 123 in Case No. 3:23-cv-2.)

### ii. *Respondent's Withdrawal*

One week after the Court denied the motion for leave to appeal, Respondent filed a motion to stay the case. (*See* Doc. 124 in Case No. 3:23-cv-2.) Respondent represented that he was facing various health issues and explained that a two-month stay would likely be sufficient to allow for his recovery. (*See id.*) The Court granted the motion to stay. (*See* Doc. 126 in Case No. 3:23-cv-2.) The Court also ordered Whiting to "remain informed of counsel's health issues on a regular basis and to secure replacement counsel if present counsel will be unable to resume his obligations by [the time the stay is lifted]." (*Id.* at 1.) Respondent was ordered to "keep his

---

[24] The Sixth Circuit affirmed this on appeal, stating that the "court's remarks to counsel rel[ied] on no extrajudicial source, and they [were] not so extreme as to display clear inability to render fair judgment." *See Whiting v. City of Athens*, No. 23-6082, 2024 WL 3537651, at *3 (6th Cir. July 25, 2024) (citation and internal quotations omitted).

client updated regarding his health situation and ability to resume his obligations in a timely fashion." (*Id.* at 1–2.)

On January 16, 2024, the day after the stay was lifted, Respondent filed a motion to withdraw as Whiting's attorney. (*See* Doc. 127 in Case No. 3:23-cv-2.) He stated:

> Grounds for this motion are that: Chief Judge Travis McDonough has made it clear that neither the plaintiff nor [Respondent] can expect to receive unbiased or effective due process as long as Judge McDonough presides over any matters where Mr. Whiting is a party, or where [Respondent] represents any party; [Respondent] will be representing plaintiff Whiting before the 6th Circuit in a closely related lawsuit that McDonough dismissed pursuant to Rule 12 (See Case #3:23-CV-220; 6th Cir. Case #23-6082); in said appeal [Respondent] intends to file a motion and brief with the 6th Circuit in said appeal requesting expedited review of McDonough's refusal to recuse himself in said related matter; based upon Judge McDonough's treatment of [Respondent] to date in this and other matters, for psychological and physical health reasons, [Respondent] is <u>unable</u> to practice before Judge McDonough, and has been advised to withdraw for said health reasons.

(*Id.* at 1 (emphasis in original).) Respondent also certified that he discussed the motion with Whiting, and that:

> Whiting [] indicated that he does not oppose this motion, and intends to proceed with this litigation pro se, unless and until Judge McDonough is recused from this matter, because Whiting believes that hiring another attorney while McDonough presides over this matter would be a waste of resources due to the clear bias of McDonough against Whiting.

(*Id.* at 2.) The Court denied the motion, as Respondent failed to comply with the Court's requirements for withdrawal set forth in Local Rule 83.4(g). (*See* Doc. 128 in Case No. 3:23-cv-2.) The Court also found that Respondent failed to adequately explain the basis for his motion. (*Id.*) The Court explained that, "despite the health reasons [Respondent] proffered two months ago to secure a temporary stay, he now appears to rely on the Court's decisions from August 2023 (Doc. 103) and before as the real reasons why he wishes to withdraw." (*Id.* at 3.) It noted that Respondent's admission that he could represent Whiting in other litigation pending before

23

the Sixth Circuit confirmed this conclusion.  (*See id.*)  The Court held "serious concerns about granting a motion to withdraw based primarily on [Respondent's] argument that the Court is biased and incapable of providing due process," as the Court did not want to encourage or condone such conduct.  (*See id.*)  The Court stated that it would consider a renewed motion to withdraw provided that Respondent complied with the Court's procedural requirements and substantiated the facts asserted about his health.  (*See id.*)  It advised Respondent that it would "take every precaution to protect [Respondent's] personal health information and is particularly interested in any evidence that a doctor has advised him to withdraw from only this case, presided over by the undersigned, while clearing him to participate in other litigation."  (*Id.* at 4.)

Rather than providing such evidence, Respondent filed a second motion to withdraw that was nearly identical to the first, this time adding that:

> [D]ue to the clear bias displayed thus far by Judge McDonough against [Respondent], plaintiff Whiting has come to the conclusion that [Respondent] can no longer effectively represent Whiting before Judge McDonough.  Whiting, therefore, has informed [Respondent] that as long as Judge McDonough is presiding over the above-identified matter, Whiting will not engage [Respondent] to represent him in this matter.

(*See* Doc. 129 in Case No. 3:23-cv-2.)  The Court granted Respondent's motion to withdraw on February 13, 2024, noting that, although Respondent did "nothing to remedy the substantive deficiencies in his first motion," it appeared undisputed that Whiting dismissed Respondent as counsel.  (*See* Doc. 138 in Case No. 3:23-cv-2.)

### iii.  *Respondent's Conduct Post-Withdrawal*

Respondent represented to the Court that he would no longer act as Whiting's counsel in the matter.  In both motions to withdraw, Respondent stated that he was unable to practice before the undersigned.  (*See* Doc. 127, at 1; Doc. 129, at 1 in Case No. 3:23-cv-2.)  In his second

24

motion to withdraw, Respondent stated that "Whiting [] has informed [Respondent] that as long as Judge McDonough is presiding over the above-identified matter, Whiting will not engage [Respondent] to represent him in this matter." (Doc. 129, at 1–2 in Case No. 3:23-cv-2.) These assertions were false, as confirmed by the actions Respondent took within days of making the assertions.

On February 18, 2024, Whiting emailed Respondent a draft response to the defendant's status report for depositions[25] and asked Respondent to "Please look over." (*See* Doc. 98-5.) The following day, Respondent returned the draft with changes.[26] (*See* Doc. 98-6.) Whiting filed the updated version in *Athens* on February 20, 2024. (*See* Doc. 148 in Case No. 3:23-cv-2.)

On April 3, 2024, Respondent sent two emails to Whiting titled "Notes on Meeting." (*See* Docs. 98-7, 98-8.) Each email references a motion to reschedule the pretrial conference ("File motion to reschedule PT conf."), a reply to the defendants' opposition to Whiting's motion for an extension of time to file deposition transcripts as a supplement to the parties' joint appendix[27] ("Reply to D's Opp. re. Mtn. ext. time re depo transcripts"), a motion in limine ("MIL"), a response to defendants Seth Sumner and Bo Perkinson's motion for summary judgment ("SS BP MSJ response"), and a response to defendant Jameson Sliger's motion for

_____

[25] This refers to a status report the defendants filed in which they detailed their efforts to schedule depositions. (*See* Doc. 147 in Case No. 3:23-cv-2.)

[26] Respondent's changes to the draft appear minor. Nonetheless, he reviewed the draft for Whiting and made alterations.

[27] See Docs. 169, 170, and 171 in Case No. 3:23-cv-2.

25

summary judgment ("Sliger MSJ response").[28]  (*See* Docs. 98-7, 98-8.)  Attached to the second email was a Word document styled as a "MOTION FOR EXTENSION OF TIME FOR PRE-TRIAL CONFERENCE."  (*See* Doc. 98-8, at 4.)  The properties to the document show that Respondent created it and was the last person to modify it before sending it to Whiting.  (*See id.* at 7.)  Whiting filed a motion with similar contents in *Athens* on April 9, 2024.  (*See* Doc. 174 in Case No. 3:23-cv-2.)

After sending these two emails on April 3, 2024, Respondent sent Whiting an email titled "Draft MIL" on the same day.  (*See* Doc. 98-9.)  Attached to the email was a Word document styled as "PLAINTIFF'S MOTION IN LIMINE."  (*See id.* at 4.)  The properties to the document show it was last modified by Respondent.  (*See id.* at 7.)  Whiting filed a nearly identical motion in limine in *Athens* on April 9, 2024.  (*See* Doc. 173 in Case No. 3:23-cv-2.)

On April 4, 2024, Respondent sent an email to Whiting titled "Reply re ext time."  (*See* Doc. 98-11.)  Attached to the email was a Word document titled "PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR EXTENSION OF TIME TO FILE SUPPLEMENT TO THE JOINT APPENDIX."  (*See id.* at 4.)  Plaintiff filed a brief with similar contents in *Athens* on April 9, 2024.  (*See* Doc. 175 in Case No. 3:23-cv-2.)  The document argued, "To oppose such motion is absurd and only done because Plaintiff is Pro Se."  (*Id.* at 1.)

On April 18, 2024, Whiting emailed Respondent a Word document titled "sumery judgement" (sic) and stated, "Just my thoughts," in the body of the email.  (*See* Doc. 98-12.)  The attached Word document contained Whiting's observations regarding the defendants'

---

[28] Respondent worked on drafts of each of these eventual filings.  (*See* Docs. 98-8, 98-9, 98-11, 98-14, 98-18; Docs. 173, 174, 175, 186 in Case No. 3:23-cv-2.)

pending motions for summary judgment.  (*See id.* at 4.)  Whiting added more observations to an updated version he emailed to Respondent on April 24, 2024.[29]  (*See* Doc. 98-13.)

On April 25, 2024, Respondent sent an email to Whiting titled "Sliger draft opposition." (*See* Doc. 98-14.)  In the email, he stated:

> Glenn,
>
> Attached is my draft opposition re Sliger.  I'm using this one as a template for Perkinson and Sumner also.  Working on that right now.  I need you to review and gather all citations you can.  I've highlighted [sic] citations to be filled in and other information I need you to provide.  I need you to attempt to finish this yourself.  I will go over it with you and we can discuss, *but it needs to be in your words*.  I'll forward the SS BP opposition as soon as it is done.
>
> Van

(*Id.* at 2 (emphasis added).)  The document attached was a draft response to defendant Jameson Sliger's motion for summary judgment.[30]  (*See id.* at 4–14.)  Later that day, Respondent sent Whiting an updated draft after adding more material.  (*See* Docs. 98-15, 98-16, 98-17.)  In the email providing the updated draft, Respondent stated, "OK.  The draft is attached.  Please work from this version.  Make changes, and save under another name."  (*See* Doc. 98-17, at 2.)

On April 26, 2024, Respondent sent Whiting the draft response to Sumner and Perkinson's motion for summary judgment that he referenced in the "Sliger draft opposition"

---

[29] This outline was roughly three pages with around one page dedicated to short bullet points presumably identifying facts Whiting felt was relevant to summary judgment.  (*See* Doc. 98-13, at 4–6.)  The rest of the outline contained quotes and annotations from a deposition.  (*See id.* at 4–5.)

[30] For Sliger's motion for summary judgment, see Docs. 163 and 164 in Case No. 3:23-cv-2.

email.[31]  (*See* Doc. 98-18.)

Next, Whiting made edits to these drafts and sent them back to Respondent.  (*See* Docs. 98-19, 98-20, 98-21, 98-22.)  Respondent then compiled the separate drafts for each response to the motions for summary judgment into an "Omnibus" draft.  (*See* Doc. 98-24.)  Whiting edited the omnibus draft and sent it back to Respondent to finalize.  (*See* Docs. 98-25, 98-26.)  Respondent made his final edits on April 29, 2024, and sent the draft back to Whiting.  (*See* Doc. 98-27.)  Whiting filed the omnibus response to the defendants' motions for summary judgment in *Athens* on May 1, 2024.  (*See* Doc. 186 in Case No. 3:23-cv-2.)  The version Whiting filed largely matches the contents of the initial drafts Respondent provided.  (*Compare* Docs. 98-17, 98-18 in Case No. 1:24-dm-7 *with* Doc. 186 in Case No. 3:23-cv-2.)  It was markedly different from Whiting's initial outline that he sent to Respondent.  (*See* Doc. 98-13.)

Some of the defendants in *Athens* caught on to Whiting's undisclosed assistance after the response to the motions for summary judgment was filed, noting that it "appear[ed] to have been drafted by multiple individuals, with various sections switching in vocabulary, tone, and point of view."  (*See* Doc. 189, at 3 in Case No. 3:23-cv-2.)  The Court took notice soon thereafter, and on May 9, 2024, it entered an order directing Whiting and Respondent to "take all actions necessary to preserve any documents, materials, data, and communications related to the response brief (Doc. 186), in whatever form or format they exist and whether or not Plaintiff may assert a claim of privilege or work-product protection."  (*See* Doc. 192, at 2 in Case No. 3:23-cv-2.)

---

[31] For Sumner and Perkinson's motion for summary judgment, see Docs. 167 and 168 in Case No. 3:23-cv-2.

28

On May 20, 2024, in the wake of this order to preserve litigation materials, Respondent filed an "emergency" motion in his appeal before the Sixth Circuit originating from Case No. 3:23-cv-220.  (*See* Doc. 16-1 in 6th Cir. Case No. 23-6082.)  Respondent argued that the order represented "further evidence of bias and vindictive behavior on the part of [the undersigned]." (*See id.* at 4.)  In response to the implication that Whiting received help in drafting the response to the motions for summary judgment, Respondent wrote that "**[f]or all [he] knows Whiting copied portions of documents prepared for unrelated matters years earlier**."  (*See id.*) Respondent casuistically noted that "**pro se filings often steal liberally from and modify filings found online from many sources**."  (*Id.* at 4 n.2.)  These misstatements, of course, came only three weeks after Respondent had emailed the very filing at issue to Whiting.  (*See* Doc. 98-27.) He concluded that he would no longer practice law after the emergency motion was filed, and that any future communication regarding the matter would be through his attorney.[32]  (*See* Doc. 16-1, at 6 in 6th Cir. Case No. 23-6082.)

### C.     The Present Disciplinary Inquiry

#### i.    *Initial Show-Cause Order and Response*

The Court initiated the present disciplinary matter via a show-cause order pursuant to Local Rule 83.7(b) on August 8, 2024.  (*See* Doc. 1.)  The order required Respondent to explain why he should not be disciplined for (1) misrepresentations to the Court regarding Glenn

---

[32] Respondent would continue representing Whiting in Case Nos. 23-6082 and 24-5919 before the Sixth Circuit after stating that Doc. 16-1 in Case No. 23-6082 would be the final motion of his legal career.  (*See also* Doc. 110, at 183, 185 (Respondent explaining that he "continue[s] to this day to be doing work for Mr. Whiting" and that he is "still litigating for [Whiting] in state court cases . . .").)

Whiting's status as a trustee in *Trew* (*see id.* at 1–2); (2) misrepresentations to the Court regarding the service of defendant Ty Gable in *Athens* (*see id.* at 2–3); and (3) preparing a response to the defendants' motions for summary judgment in *Athens* after he withdrew from representation and the plaintiff was proceeding pro se, *i.e.*, "ghostwriting" (*see id.* at 3).

On August 15, 2024, the Court appointed attorney Lance Pope and his firm, Patrick, Beard, Schulman & Jacoway, PC, to investigate and prosecute the allegations of Respondent's misconduct. (*See* Doc. 2.)

Respondent filed a response to the show-cause order on September 23, 2024. (*See* Doc. 7.) Regarding the misrepresentation of Whiting's status as a trustee, Respondent claimed that (1) he relied on his client's statements, (2) he saw allegedly favorable language in the trust documents but not the language indicating Whiting was not a trustee,[33] and (3) the misrepresentations were not material. (*Id.* at 6–10.) He denied the allegations regarding service of Ty Gable. (*Id.*, at 11–13.) Regarding the ghostwriting, Respondent refused to admit or deny the allegation as Local Rule 83.7(e)(2) required, arguing that the allegation was merely the undersigned's opinion and not a factual allegation. (*Id.* at 13–17.) He further suggested that Whiting might have used the work product Respondent had previously supplied him to cobble together the response to the motion for summary judgment.[34] (*Id.* at 15–16.) Respondent

---

[33] All relevant language appears on the same page. (*See* Doc. 86, at 189 in Case No. 3:20-cv-54.)

[34] This mirrors Respondent's misrepresentation to the Sixth Circuit months prior regarding the very same offending document in his motion for emergency injunctive relief against the undersigned: "For all Irion knows Whiting copied portions of documents prepared for unrelated matters years earlier." (*See* Doc. 16-1, at 4 in 6th Cir. Case No. 23-6082; *supra* Section II.B.iii.)

asserted, "Also, Whiting has stated that he has a non-lawyer friend who helped him draft and put together the accused document, along with other filings." (*Id.* at 16.)

### ii. *Motion to Recuse*

On October 18, 2024, Respondent filed a motion requesting that the undersigned and Chief Magistrate Judge Christopher H. Steger recuse from this matter.[35] (*See* Doc. 12.) Respondent raised arguments concerning (1) the Court's case-assignment procedures (*see* Doc. 12, at 20–22; Doc. 24, at 4–6); (2) alterations to the record on ECF (*see* Doc. 12, at 23–25; Doc. 24, at 8–9); (3) his due-process rights in the present proceedings (*see* Doc. 12, at 2, 25; Doc. 24, at 12); and (4) the perceived intent of the undersigned to retaliate against him (*see* Doc. 12, at 25–27; Doc. 24, at 13–15). Respondent also took issue with fact that Chief Magistrate Judge Steger and the undersigned previously worked at the same law firm, and he alleged that Chief Magistrate Judge Steger should recuse because the undersigned appointed him to the bench.[36] (*See* Doc. 12, at 2, 8, 28; Doc. 25, at 3.) The Court denied Respondent's motion to recuse in two orders (Docs. 24, 25), with the judges explaining their decisions not to recuse.

### iii. *Motion to Unseal*

Respondent filed a motion to unseal these proceedings on October 28, 2024. (*See* Doc. 13.) Chief Magistrate Judge Steger denied the motion, explaining that disciplinary proceedings

---

[35] On August 28, 2024, the Court appointed Chief Magistrate Judge Steger to "handle any matters routinely considered by a magistrate judge pursuant to 28 U.S.C. § 636(b), the Rules of this Court, or further order of the presiding Chief District Judge." (*See* Doc. 3.)

[36] Chief Magistrate Judge Steger's federal judicial service began almost five months before the undersigned received his commission.

31

are conducted under seal pursuant to Local Rule 83.7(b) and that there was no reason to deviate from this rule in the present matter.  (*See* Doc. 17.)

### iv.  *Discovery*

Pursuant to the Court's order requiring Respondent and Pope to apply for leave to conduct discovery (Doc. 8), each party filed motions in the fall of 2024.  (Docs. 9, 20.)  The Court granted Pope's motion for certain discovery from Respondent, Whiting, and other sources (Doc. 11) and granted in part and denied in part Respondent's motion for discovery.  (Docs. 30, 45.)  Respondent received Pope's discovery requests on October 21, 2024.  (*See* Doc. 36, at 1.)

### a.  Crime-Fraud Exception

On November 12, 2024, Respondent filed a motion for a protective order against Pope's discovery of communications and materials sent between Respondent and Whiting.  (*See* Doc. 19.)  Respondent argued that the attorney-client privilege and the work-product doctrine barred some of Pope's requests for production contained in the subpoena he served upon Whiting.  (*See id.*)  Chief Magistrate Judge Steger denied the motion, finding that Respondent should have raised any objections to Pope's subpoena within the 14-day deadline outlined by Federal Rule of Civil Procedure 45(d)(2)(B) (*see* Doc. 29, at 4–5) and that the crime-fraud exception applied to the discovery Pope sought (*see id.*).  Respondent objected to Chief Magistrate Judge Steger's ruling (*see* Doc. 33), and the Court overruled his objection (*see* Doc. 44), deciding that Chief Magistrate Judge Steger properly applied the crime-fraud exception and Rule 45.  (*See id.* at 4–9.)  On January 27, 2025, the Court ordered Whiting to produce the discovery sought in compliance with Pope's subpoena.  (*See id.* at 11.)

b.   Respondent's Pursuit of Discovery from the Court

On November 15, 2024, Respondent filed a motion for leave to seek written discovery from the Court.  (*See* Doc. 20.)  Respondent specifically requested that the undersigned or "an agent of the Court" respond to his requests.[37]  (*See id.*)  Chief Magistrate Judge Steger denied Respondent leave to propound any discovery (1) pertaining to the Court's case-assignment procedures (*see* Doc. 30, at 3–4) or (2) directed at the undersigned specifically (*see id.* at 4).  But Respondent was granted leave to seek discovery that was "within the scope of information related to the attorney disciplinary action against [Respondent]" and directed Pope to furnish responses to certain discovery requests he explicitly identified in the order.  (*See id.* at 5–6.)  Respondent objected to Chief Magistrate Judge Steger's order (*see* Doc. 35), and the Court overruled his objection (*see* Doc. 45).

c.   Respondent's Request that the Presiding Judge Sanction Himself

On January 2, 2025, Respondent filed a motion seeking Rule 11 sanctions against the undersigned.  (*See* Doc. 34.)  Respondent argued that the undersigned should sanction himself because (1) the Court had not complied with the Local Rules concerning disciplinary proceedings (*see id.* at 4–5); (2) the Court's show-cause order in this matter contradicted a previous order in *Trew* (*see id.* at 6–8); and (3) the Court failed to address the alleged problems

---

[37] Not only was Respondent seeking discovery from the undersigned (the presiding judge in this matter), but many of Respondent's requests also focused on the Court's case-assignment procedures or alleged alterations to the record on ECF.  (*See* Doc. 20-1.)  These topics had no bearing on the present matter, and his contentions regarding case assignment were addressed in previous litigation.  (*See supra* Section II.B.i); *Whiting v. City of Athens*, No. 23-6082, 2024 WL 3537651, at *3 (6th Cir. July 25, 2024).  Respondent also filed a complaint of judicial misconduct regarding the alleged alterations on ECF, but the complaint was dismissed.  (*See* Doc. 30-1, at 4–6 in M.D. Tenn. Case No. 3:25-cv-1.)

with its ECF dockets (*see id.* at 8–10).  The Court denied the motion, explaining that Rule 11 does not apply to a presiding judge (*see* Doc. 50, at 2), that the Court had complied with its Local Rules (*see id.* at 2–3), and that it had addressed Respondent's other contentions in previous orders (*see id.* at 3).

      d.   <u>First Order Compelling Discovery from Respondent</u>

On January 14, 2025, Pope filed a motion to compel Respondent's discovery responses. (*See* Doc. 36.)  On January 30, 2025, Chief Magistrate Judge Steger heard argument on the motion.  (*See* Doc. 46.)  Respondent and Pope ultimately "agreed that Respondent would respond by February 13, 2025, to the Interrogatories, Request for Production of Documents, and Requests for Admission served to him on October 21, 2024," and the Court ordered him to do so. (*See* Doc. 47.)

      e.   <u>Respondent's Motion for Interlocutory Appeal on Crime-Fraud Exception</u>

On February 6, 2025—despite the discovery order and his agreement to provide discovery responses by February 13, 2025—Respondent moved for leave to file an interlocutory appeal of the Court's order denying his motion for a protective order.  (*See* Docs. 47, 51, 52.) The Court denied Respondent leave to appeal.[38]  (*See* Doc. 61.)  Respondent then filed a motion for reconsideration of the Court's order denying him leave to appeal (*see* Doc. 64), and the Court denied that motion as well (*see* Doc. 72).  Nevertheless, he continued to ignore his discovery obligations.

---

[38] Respondent also sought a stay of discovery that the Court denied.  (*See* Doc. 61, at 9.)

f.   Pope's Efforts to Obtain Discovery from Whiting

On February 14, 2025, Pope filed a motion to compel Whiting's compliance with, first, the subpoena to him seeking the production of discovery materials and, second, the Court's prior order directing Whiting to comply with the subpoena.[39]  (*See* Doc. 55.)  On February 20, 2025, Pope filed a motion to authorize alternative service on Glenn Whiting.  (*See* Doc. 56.)  Pope represented that the process server he engaged had made several attempts to serve a deposition subpoena[40] on Whiting but was unsuccessful.  (*See id.*)

On March 3, 2025, Chief Magistrate Judge Steger set a discovery hearing for March 13, 2025 (*see* Doc. 65) and entered orders directing Whiting to appear at the hearing.  (*See* Doc. 66, 67.)  Chief Magistrate Judge Steger also directed the United States Marshal's Service (hereinafter "USMS") to serve the order on Whiting, as he concluded that Whiting was actively evading service.  (*See* Doc. 66, at 2; Doc. 67, at 1.)

Respondent filed a motion to continue the March 13, 2025 hearing.  (*See* Doc. 71.) Respondent and his counsel stated that they could not attend the hearing and argued that Respondent had a right to attend such hearing to object to any discussion of material protected by attorney-client privilege.[41]  (*See* Doc. 71, at 4–5.)  Respondent argued that any disclosure of the information Pope sought in his discovery requests at the hearing would irreparably harm Respondent and Whiting, citing the pending motion for reconsideration on the Court's order

---

[39] Pope was referring to the Court's order in Doc. 44.

[40] This deposition subpoena was distinct from the subpoena seeking the production of discovery materials that Pope had already served on Whiting.

[41] Respondent's counsel represented that he was participating in a mediation on March 13, 2025. (*See* Doc. 71, at 1.)

denying an interlocutory appeal.[42]  Chief Magistrate Judge Steger denied the motion to continue. (*See* Doc. 73.)  He explained that the Court had addressed Respondent's arguments regarding attorney-client privilege and the work-product doctrine multiple times.  (*See id.* at 4–5.)  Further, he established that the purpose of the hearing was to enforce the Court's previous orders, not to rehash Respondent's arguments.  (*See id.* at 6.)  He also explained that Respondent's counsel did not represent Whiting, as he was a non-party witness.  (*See id.* at 4.)  Chief Magistrate Judge Steger ultimately provided Respondent's counsel with a Zoom link to the hearing and stated Respondent's counsel would be afforded an opportunity to speak.[43]  (*See id.* at 5.)

The hearing proceeded as scheduled on March 13, 2025.  (*See* Doc. 75.)  Chief Magistrate Judge Steger ordered Whiting to produce his laptop and cellphone to ensure the production of materials responsive to Pope's discovery requests.  (*See* Doc. 77.)  Whiting partially complied with the Court's orders regarding his production on March 18, 2025, when he produced documents responsive to Pope's discovery requests.[44]  (*See* Doc. 80.)

Following the hearing, Pope filed a new motion to compel after Whiting defied Chief Magistrate Steger's order detailing the materials Whiting needed to produce.  (*See* Doc. 78.) Respondent filed a response to this motion, as he objected to the scope of Whiting's ordered

--------

[42] The Court resolved the motion for reconsideration shortly after Respondent filed the motion to continue but before the March 13, 2025 hearing.  (*See* Doc. 72.)

[43] Chief Magistrate Judge Steger also noted that he "participated in hundreds of mediations, and has observed that there are periods of time during a mediation when attorneys are free to make phone calls and work on other matters. . . . [Respondent's counsel] should be able to carve out time for [the hearing] despite his other commitment."  (Doc. 73, at 5–6.)

[44] Whiting never fully complied with the Court's orders.  (*See* Doc. 77.)  He never produced his laptop or mobile phone.  (*See* Doc. 78.)

36

production and took issue with Chief Magistrate Judge Steger's hearing. (*See* Doc. 79.) Chief Magistrate Judge Steger ultimately held that Pope's motion to compel was moot following Whiting and Respondent's production of documents relevant to this proceeding. (*See* Doc. 102.)

g.  Second Order Compelling Discovery from Respondent

On March 4, 2025—still having received no discovery from Respondent, Pope filed another motion to compel. (*See* Doc. 68, at 1–2; Doc. 47.) The Court offered the following recap of discovery in response to Pope's motion:

> Despite his agreement [to respond to Pope's requests] and the Court's order, Respondent chose a different path. On February 6, 2025 (barely a week after Chief Magistrate Judge Steger's order [establishing the February 13, 2025 deadline]), Respondent filed a motion for certification of an interlocutory appeal of the Court's prior denial of a protective order that would have relieved him of certain discovery obligations. (*See* Doc. 51; Doc. 52, at 1.) Then, on February 10, 2025, Respondent filed a motion requesting an extension of time to respond to Pope's discovery, arguing that his pending motion for the certification of an interlocutory appeal justified a stay of discovery. (*See* Doc. 53.) On February 25, 2025, the Court denied Respondent's motion for certification of an interlocutory appeal and his motion seeking a stay of discovery. (*See* Doc. 61, at 9.) Still, Respondent did not respond to Pope's discovery requests, so Pope filed a second motion to compel on March 4, 2025, asking again (as he did in the January motion (*see* Doc. 36)) that outstanding requests for admission be deemed admitted. (*See* Doc. 68.) On March 17, 2025, over a month after the date by which Respondent agreed to comply with Pope's discovery requests, Respondent finally served written responses but still did not comply with Chief Magistrate Judge Steger's January 31, 2025 order (Doc. 47). (*See* Docs. 81, 81-1.) Respondent filed no response to Pope's motion. *See* E.D. Tenn. L.R. 7.1(a).
>
> Pope first sought leave to serve Respondent with discovery on October 8, 2024. (*See* Doc. 9.) The Court granted Pope leave to conduct all discovery he identified in his motion on October 11, 2024. (Doc. 11.) Since then, the Court has devoted substantial time and effort to resolving the discovery disputes Respondent has spurred. (*See* Docs. 29–30, 43–45, 47, 61, 72.) The Court previously encouraged Respondent "to give serious consideration to the choices he and his counsel make," as "[t]hose choices should reflect respect for the serious and sober nature of this proceeding." (Doc. 24, at 18.) Rather than cooperating, Respondent has complicated and frustrated the discovery process. The Court has entered four orders disposing of Respondent's assertions of attorney-client and work-product privileges (including his requests for an appeal and for

37

> reconsideration), spanning roughly four months.  (*See* Docs. 29, 44, 61, 72.)
> Despite the Court's holdings, Respondent continues to refuse production of
> documents and written responses based on the same assertions.  (*See* Doc. 81-1.)
> The time to move forward has long passed.  The Court will not tolerate further
> delay as a result of Respondent's choices.

(Doc. 82, at 1–3.)  Because Respondent had not produced any documents responsive to Pope's

discovery requests and refused to answer several questions in Pope's written discovery, the Court

granted Pope's motion.  (*See id.* at 3.)  The Court ordered Respondent to produce the responsive

materials by March 28, 2025.  (*See id.*)

Respondent finally produced materials responsive to Pope's discovery requests on March

27, 2025, providing electronic files from his computer in a digital folder entitled "TNED

witchhunt."  (*See* Doc. 83.)

###    v.    *Amended Response and Amended Show-Cause Order*

In the foregoing order compelling Respondent to produce documents, the Court noted

that it had reviewed Whiting's March 18, 2025 production (which included emails evidencing

Respondent's work on Whiting's "pro se" filings after he withdrew as Whiting's counsel in

*Athens*) and Respondent's written discovery responses (which disclaimed any such work after

Respondent's withdrawal).  (Doc. 81-1, at 12–13; Doc. 82, at 4.)  As a result, the Court expressed

concern "about the substance of Respondent's response to the Court's show-cause order."  (*See*

Doc. 82, at 4 (citing Doc. 7).)  The Court ordered Respondent to file an amended response to the

Court's show-cause order.  (*See id.*)  The Court invited Respondent to correct any inaccuracies in

his original response and advised Respondent that it would "consider the substance of the

amendment, or lack thereof, as appropriate in its resolution of these proceedings."  (*See id.*)

Respondent filed an amended response to the Court's show-cause order on March 28,

2025, but that amended response again failed to comply with the Local Rules; specifically,

Respondent persisted in refusing to admit or deny "whether he drafted documents for his ostensibly pro se former client." (*See* Doc. 86; Doc. 91, at 2.) Even after the Court had drawn Respondent's attention to the troublesome materials in Whiting's production (Doc. 82, at 4), and even after Respondent had finally produced similarly inculpatory evidence (Docs. 84, 98, 101), Respondent continued to suggest that Whiting might have crafted the filings based on drafts Respondent supplied him prior to his withdrawal as counsel:

> The Respondent yet again states, that he has supplied Mr. Whiting with dozens, if not hundreds, of legal filings over a decade that included the legal issues and arguments outlined in Whiting's filing. The Respondent again states that he had begun preparing a response to a motion for summary judgment that was filed before the Respondent withdrawing and that he supplied that draft to Whiting, as was Whiting's right to demand work product produced before the withdrawal. The Respondent also states that he is informed that Whiting received assistance from a non-attorney third party whom Irion has never met or communicated with, in preparing the filings the Court cites.

(Doc. 86, at 7.) In a departure from his original response, Respondent explicitly requested a hearing in accordance with Local Rule 83.7(e)(4). (*See id.* at 7.)

Following Respondent's continued non-compliance with the Local Rules, on April 23, 2025, the Court entered an amended show-cause order. (*See* Doc. 91.) Therein, the Court detailed eleven specific factual allegations of misconduct, citing the Rules of Professional Conduct at issue and evidence of Respondent's suspected misconduct:

**Factual Allegation No. 1:** **Respondent prepared and filed an affidavit misrepresenting that Glenn Whiting was a trustee of a trust called ARD Property Management.**

- Source/Example: Doc. 149 in Case No. 3:20-cv-54 in *Whiting et al. v. Trew, et al.*, Case No. 3:20-cv-54.

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.1, 1.3, 3.1, 3.3, 3.4, and 8.4 and Federal Rule of Civil Procedure 11.

39

**Factual Allegation No. 2:** **In written materials submitted to the Court, Respondent misrepresented Glenn Whiting's status as a trustee.**

- Source/Example: Doc. 147, at 11–12, 14–15, 18 in *Whiting et al. v. Trew, et al.*, Case No. 3:20-cv-54.

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.1, 1.3, 3.1, 3.3, 3.4, and 8.4 and Federal Rule of Civil Procedure 11.

**Factual Allegation No. 3:** **In communication with the Court, Respondent misrepresented Glenn Whiting's status as a trustee.**

- Source/Example: Final Pretrial Conference Transcript in *Whiting et al. v. Trew, et al.*, Case No. 3:20-cv-54.

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.1, 1.3, 3.1, 3.3, 3.4, and 8.4 and Federal Rule of Civil Procedure 11.

**Factual Allegation No. 4:** **At trial, Respondent offered witness testimony that misrepresented Glenn Whiting's status as a trustee.**

- Source/Example: Doc. 202, at 30–32 in *Whiting et al. v. Trew, et al.*, Case No. 3:20-cv-54.

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.1, 1.3, 3.1, 3.3, 3.4, and 8.4 and Federal Rule of Civil Procedure 11.

**Factual Allegation No. 5:** **In other filings with the Court, Respondent misrepresented the contents of the trust documents.**

- Source/Example: Doc. 91, at 6 in *Whiting v. City of Athens, et al.*, Case No. 3:23-cv-2.
- Professional Standards at Issue: Tennessee Rules of Professional Conduct 3.3 and 8.4(c) and Federal Rule of Civil Procedure 11.

**Factual Allegation No. 6:** **In written materials submitted to the Court, Respondent misrepresented Glenn Whiting's status as a beneficiary.**

- Source/Example**:** Doc. 78, at 5 in *Whiting et al. v. Trew, et al.*, Case No. 3:20-cv-54.

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.1, 1.3, 3.1, 3.3, 3.4, and 8.4 and Federal Rule of Civil Procedure 11.

40

**Factual Allegation No. 7:** Respondent prepared Glenn Whiting's response to the defendants' motions for summary judgment while Whiting was proceeding pro se.

- Source/Example: Doc. 186 in *Whiting v. City of Athens, et al.*, Case No. 3:23-cv-2.

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.2(d) and 8.4(c).

**Factual Allegation No. 8:** Respondent prepared Glenn Whiting's response to the defendants' status report for depositions while Whiting was proceeding pro se.

- Source/Example: Doc. 148 in *Whiting v. City of Athens, et al.*, Case No. 3:23-cv-2.

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.2(d) and 8.4(c).

**Factual Allegation No. 9:** Respondent prepared Glenn Whiting's motion in limine while Whiting was proceeding pro se.

- Source/Example: Doc. 173 in *Whiting v. City of Athens, et al.*, Case No. 3:23-cv-2.

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.2(d) and 8.4(c).

**Factual Allegation No. 10:** Respondent prepared Glenn Whiting's motion to continue the final pretrial conference while Whiting was proceeding pro se.

- Source/Example: Doc. 174 in *Whiting v. City of Athens, et al.*, Case No. 3:23-cv-2.

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.2(d) and 8.4(c).

**Factual Allegation No. 11:** Respondent prepared Glenn Whiting's reply brief in support of a motion for an extension of time to file a supplement to the joint appendix for summary judgment while Whiting was proceeding pro se.

- Source/Example: Doc. 175 in *Whiting v. City of Athens, et al.*, Case No. 3:23-cv-2.

41

- Professional Standards at Issue: Tennessee Rules of Professional Conduct 1.2(d) and 8.4(c).

(*See id.* at 2–5.)  The first six allegations concern his misrepresentations about Whiting's status as a trustee or beneficiary of ARD in *Trew*.  (*See id.* at 2–4.)  The remaining five allegations concern Respondent's misrepresentations relating to his efforts to assist his ostensibly pro se client after Respondent withdrew from representation in *Athens*.[45]  (*See id.* at 4–5.)  The Court ordered Respondent to (1) file an amended response to the updated show-cause order; (2) admit or deny each of the eleven factual allegations in the updated show-cause order pursuant to Local Rule 83.7(e)(2); and (3) include any evidence relevant to the allegations with his response pursuant to Local Rule 83.8(e)(3).  (*See id.* at 5–6.)  The Court advised Respondent that if he failed to comply with the Local Rules again, the factual allegations in the show-cause order would be deemed admitted and he would forfeit the right to present any evidence not submitted with his response.  (*See id.*)  Lastly, the Court continued the final hearing in this matter to ensure Respondent was provided twenty-one days to respond and twenty-one days' notice as to his rights at the hearing in accordance with Local Rule 83.7(i).  (*See id.* at 6.)

Respondent filed his response to the amended show-cause order on May 14, 2025.  (*See* Doc. 99.)  Regarding the first six allegations, he admitted that he had presented inaccurate documents and testimony to the Court in *Trew*, but he denied any misconduct, asserting that he had relied on the statements of his clients.  (*See id.* at 4–6.)  Respondent refused to admit or deny the remaining five factual allegations based on misrepresentations relating to ghostwriting in

---

[45] The Court omitted any factual allegations of misconduct pertaining to service in *Trew*, as it found that the evidence adduced on that topic demonstrated that Respondent's conduct did not warrant discipline.  (*See* Doc. 91, at 5.)

42

*Athens*. He claimed that he lacked personal knowledge sufficient to admit or deny the allegations, despite having recently produced his own email correspondence demonstrating his post-withdrawal work for Whiting. (*See id.* at 6.) The Court entered an order deeming factual allegations 7, 8, 9, 10, and 11 in the Court's amended show-cause order admitted consistent with the Court's prior warning to Respondent.[46] (*See* Doc. 104.)

### vi. *Respondent's Constitutional Challenge*

On May 14, 2025, Respondent filed a motion requesting that the Court declare its Local Rules unconstitutional. (*See* Doc. 100.) Again, he took issue with the undersigned's decision to preside over this matter and the court's case-assignment procedures. (*See id.* at 2.) Respondent also asserted that Local Rule 83.6 was unconstitutionally vague. (*See id.* at 1–2.) The Court denied this motion on May 19, 2025. (*See* Doc. 105.)

### vii. *Respondent's Waiver of a Hearing*

On May 20, 2025, two days prior to the final hearing, Respondent filed a notice waiving his right to a hearing and explaining that he "will await the Court's ruling based on the admissible evidence and the record before it."[47] (*See* Doc. 107.) The Court canceled the final hearing the next day. (*See* Doc. 111.)

---

[46] Thus, it is conclusively established that Respondent helped prepare the following documents for Whiting while Whiting was proceeding pro se: (1) Whiting's response to the defendants' motion for summary judgment (Doc. 186 in *Athens*); (2) Whiting's response to the defendants' status report for depositions (Doc. 148 in *Athens*); (3) Whiting's motion in limine (Doc. 173 in *Athens*); (4) Whiting's motion to continue the final pretrial conference (Doc. 174 in *Athens*); and (5) Whiting's reply brief in support of a motion for an extension of time to file a supplement to the joint appendix for summary judgment (Doc. 175 in *Athens*). (Docs. 91, 104.) These findings are also clearly in accord with the relevant evidence. (*See supra* Section II.B.iii.)

[47] On the same day, Respondent filed a notice informing the Court that he had named the undersigned and "two Court staffers as defendants" in his suit in the Middle District of

43

# III.     ANALYSIS OF RESPONDENT'S CONDUCT

With the foregoing factual background in mind, the Court has carefully considered the implications of Respondent's conduct in *Trew*, *Athens*, and the instant proceeding. The Court finds by clear and convincing evidence that Respondent has violated his ethical obligations. The following analysis addresses these violations in detail.

## A.     RESPONDENT'S MISCONDUCT IN *TREW*

The relevant questions arising from Respondent's conduct in *Trew* are (1) what he understood about Whiting's status with respect to the trust, and when he understood it; and (2) regardless of any gaps or deficiencies in Respondent's understanding, how he conducted himself with respect to his client's status under the relevant ethical rules. The Court will first review Respondent's representations about his conduct and then discuss the relevant evidence.

### i.    *Show-Cause Order and Response*

In the original order initiating this matter, the Court ordered Respondent to show cause why he should not be disciplined for misrepresenting Whiting's status as a trustee in *Trew*. (*See* Doc. 1, at 1–2.) Respondent asserted that, in preparing the declaration for Whiting (Doc. 98-4), he had relied on Whiting's statement that he was a trustee. (*See* Doc. 7, at 6, 8.) Respondent

---

Tennessee. (*See* Doc. 106.) To the extent Respondent submitted this notice to suggest that the undersigned should recuse from this matter, initiating separate litigation against a presiding judge does not necessitate recusal. *See United States v. Houston*, No. CRIM.A. 3:13-10-DCR, 2014 WL 813975, at *11 (E.D. Tenn. Mar. 3, 2014) ("[R]ecusal is not required just because one of the parties has initiated litigation against the presiding judge.") (citing *Callihan v. Eastern Ky. Prod. Credit Ass'n*, No. 89–5578, 1990 WL 12186, at *2 (6th Cir. Feb.13, 1990) and *In re Taylor*, 417 F.3d 649, 652 (7th Cir. 2005)); *see also Hopson v. Gray*, No. 5:21-CV-704, 2021 WL 4894311, at *4 (N.D. Ohio Oct. 20, 2021) (same); *United States v. Wright*, No. 2:16-CR-59, 2023 WL 7313262, at *2 (S.D. Ohio Jan. 9, 2023) (same), *aff'd*, No. 23-3114, 2023 WL 7286605 (6th Cir. Sept. 20, 2023), *cert. denied*, 144 S. Ct. 521, 217 L. Ed. 2d 273 (2023).

stated that Whiting's entire family believed he was a trustee, and that Whiting had been acting as

a trustee when Respondent prepared the declaration. (*See* Doc. 7, at 6.) Respondent also argued

that the Court's summary judgment order (Doc. 178 in Case No. 3:20-cv-54) rendered Whiting's

status as a trustee irrelevant in *Trew*. (*See* Doc. 7, at 6–7.) Specifically, Respondent stated that

"upon reading [the undersigned's] ruling in December [2021], both the Respondent and Mr.

Whiting justifiably believed that the standing issue had been decided and that whether Whiting

was officially a trustee or not, did not matter." (*Id.* at 7 (emphasis omitted).) He explained that

he did not review the trust documents thoroughly due to the Court's ruling.[48] (*See id.*)

Respondent further argued that, "[a]t the time Whiting signed the declaration, both Respondent

and Whiting believed it to be true. . . . [A]nd most importantly, [the undersigned's] ruling in said

case had established that the fact at issue was irrelevant to the case."[49] (*Id.* at 9.) Regarding his

inaccurate representation of ARD's trust documents in *Athens* (*see supra* Note 21), Respondent

---

[48] In response to Pope's interrogatory requests in this matter, Respondent also stated that he was
unaware of the portion of the trust documents outlining the requirements for approval of a new
trustee until Whiting was presented with them at trial. (*See* Doc. 81-1, at 8.) Respondent
reiterated this in his April 2, 2025 deposition. (*See* Doc. 110, at 49–50.)

[49] Respondent reiterated his argument regarding the relevance of the inaccurate representations
he made to the Court in *Trew* throughout the present matter. (*See* Doc. 34, at 6–7; Doc. 41, at 8.)
Most notably, Respondent argued that the undersigned misrepresented "his own factual findings
and conclusions of law," such that the undersigned should impose Rule 11 sanctions upon
himself. (*See* Doc. 34, at 6–8.) Respondent's argument pertaining to the relevance of his
inaccurate submissions is misleading and directly contradicted by the record in *Trew*. Several of
Respondent's inaccurate representations occurred before the Court's summary judgment ruling,
meaning that the ruling could not have rendered those representations irrelevant. (*See supra*
Section II.A.) The Court also dispelled Respondent's contention in a previous order. (*See* Doc.
45, at 9–13.)

asserted that the documents "actually state that Whiting would become a trustee upon the death of any of the then-current trustees." [50] (*See* Doc. 7, at 9.)

Respondent has since admitted that his representations to the Court regarding Whiting's relationship with ARD were inaccurate. In his response to the amended show-cause order (Doc. 91), Respondent acknowledges that he offered inaccurate information but contends that he did not intend to mislead the Court. (*See* Doc. 99, at 4–6.) Respondent also asserts that he relied on the representations of his client, Whiting, when offering inaccurate information to the Court.[51] (*See id.*) Respondent claims that the trustees of ARD told him that Whiting was a trustee. (Doc. 110, at 80.) He asserts that he did not read the portion of ARD's trust documents outlining Whiting's relationship with the trust until Whiting was presented with them at trial. (*See id.* at 49–50.) Respondent also asserts that he and Whiting were "completely shocked" by the contents of the trust documents after reading them at trial. (*See id.* at 72.) Respondent himself acknowledges that his conduct was "negligence, maybe." (*Id.* at 113.)

As Respondent now admits, his representations to the Court concerning Whiting's status as a trustee and beneficiary of ARD were inaccurate. (*See* Doc. 99, at 4-6.) Therefore, the Court must determine what led to these inaccuracies. If there is clear and convincing evidence that

---

[50] The page Respondent cited does not state this, as it establishes that Whiting's appointment as an acting trustee rested within the discretion of ARD's board of trustees and that certain prerequisites had to be completed prior to Whiting's appointment. (*See* Doc. 86, at 189 in Case No. 3:20-cv-54.)

[51] Respondent has not offered any competent evidence to corroborate this assertion, as discussed *supra* in Section II.C.v.

Respondent knowingly misled the Court about Whiting's status as a trustee or beneficiary of ARD, then the following Tennessee Rules of Professional Conduct ("TRPC") are implicated:

**TRPC 3.3(a)(1):**  A lawyer shall not knowingly make a false statement of fact or law to a tribunal.

**TRPC. 3.3(b):**  A lawyer shall not offer evidence the lawyer knows to be false[.]

**TRPC 3.3(c):**  A lawyer shall not affirm the validity of, or otherwise use, any evidence the lawyer knows to be false.

**TRPC 3.3(g):**  A lawyer who, prior to conclusion of the proceeding, comes to know that the lawyer has offered false tangible or documentary evidence shall withdraw or disaffirm such evidence without further disclosure of information protected by RPC 1.6.

**TRPC 3.4(b):**  A lawyer shall not falsify evidence, counsel or assist a witness to offer false or misleading testimony[.]

**TRPC 8.4(c):**  It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

**TRPC 8.4(d):**  It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

TRPC 3.3 prohibits an attorney from knowingly offering a false statement or evidence to the Court.  It also requires that an attorney disaffirm any evidence when he comes to know that it is false.  A violation of TRPC 3.3 would inherently violate both TRPC 8.4(c) and (d), which prohibit dishonest conduct generally and conduct prejudicial to the administration of justice.  *See* Ann. Mod. Rules Prof. Cond. *Misconduct* § 8.4 (explaining that Model Rule "Rule 8.4(c) is also implicated when a lawyer misleads or lies to a tribunal [in violation of Model Rule 3.3]" and that "[l]ying or misleading a court can violate [Model Rule] Rule 8.4(d)").  TRPC 3.4(b) specifically prevents an attorney from falsifying evidence or assisting or advising a witness to offer false or misleading testimony.

47

Whether Respondent breached these rules turns on whether he knew the statements and testimony regarding Whiting's status as a trustee or beneficiary were false. TRPC 1.0(f) defines knowledge as "actual awareness of the fact in question," and provides that a "person's knowledge may be inferred from circumstances."

If Respondent did not know the statements and testimony regarding Whiting's relationship to ARD were false, the following rules are potentially implicated:

**TRPC 1.1:** A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

**TRPC 1.3:** A lawyer shall act with reasonable diligence and promptness in representing a client.

**TRPC 3.1:** A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless after reasonable inquiry the lawyer has a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established.

**TRPC 8.4(d):** It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

TRPC 1.1 establishes that competent representation requires "thoroughness" and "preparation" reasonably necessary for representation. Comment 5 to TRPC 1.1 provides that:

Competent handling of a particular matter includes *inquiry into and analysis of the factual and legal elements of the problem*, and the use of methods and procedures meeting the standards of competent practitioners. It also *includes adequate preparation*. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence.

(emphasis added). TRPC 1.3 requires "reasonable diligence," and this inherently requires "an adequate level of preparation and investigation for each particular representation." *See* Ann.

48

Mod. Rules Prof. Cond. *Diligence* § 1.3 (explaining that Model Rule 1.3 "requires an adequate level of preparation and investigation for each particular representation"). TRPC 3.1 requires a "reasonable inquiry" into the law and facts supporting an argument. The American Bar Association ("ABA") advises that Model Rule of Professional Conduct 3.1[52] "parallels and can be analyzed in tandem with Rule 11 of the Federal Rules of Civil Procedure," as Rule 11 also requires a reasonable inquiry into the facts and law relevant to a claim. *See* Ann. Mod. Rules Prof. Cond. *Meritorious Claims and Contentions* § 3.1; Fed. R. Civ. P. 11(b). The ABA also notes that "[n]egligent or incompetent representation can violate [Model] Rule 8.4(d)."[53] Ann. Mod. Rules Prof. Cond. *Misconduct* § 8.4. Essentially, under TRPCs 1.1, 1.3, 3.1, and 8.4(d), an attorney is required to conduct an objectively reasonable investigation into the facts and law supporting a contention he presents to the Court. *See* TRPC 1.0(h) (defining "reasonable" and "reasonably" when "used in relation to conduct by a lawyer" as "the conduct of a reasonably prudent and competent lawyer").

### ii. *Evidence of Respondent's Knowledge*

There is substantial evidence that Respondent knew full well he was presenting false statements to the Court.

First, Respondent's repeated references to the trust documents (*see supra* Section II.A) amounted to representations that he had read them, contrary to his representations in the present matter. (*See, e.g.*, Doc. 99, at 4–6; Doc. 110, at 49–50.) When an attorney makes representations

---

[52] The language in TRPC 3.1 tracks that of the Model Rule.

[53] The language in TRPC 8.4(d) matches the Model Rule.

related to a document—and Respondent did just that (*see supra* Section II.A)—any court would understand that the attorney had read and understood the document. *Cf. Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024) (holding that Rule 11 requires "that attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely"); *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 464 (S.D.N.Y. 2023) (holding that an attorney violated Rule 11 by not reading the cases he cited in briefing). Thus, Respondent's present position—that he did not read the document closely—is contrary to his prior representations to the Court.

Second, it is extremely unlikely that Respondent could have read what he asserts is the favorable portion of the trust documents without necessarily stumbling upon the language establishing that Whiting was not a trustee. Respondent invokes the final paragraph of the page designating Whiting as a potential successor trustee and says he "could reasonably assume that the Trustees had voted to pre-accept Whiting as a Successor Trustee." (Doc. 7, at 8.) But he also states one page later that, somewhere:

> The trust documents actually do state that Whiting would become a trustee upon the death of any of the then-current trustees. . . . As discussed above, both Respondent and Whiting had seen that language in the trust documents. Unfortunately, the trust documents also include the language that requires a vote. Neither Respondent nor Whiting had seen that language until the April 2021 trial.

(Doc. 7, at 9 (citing Doc. 86, at 189 in Case No. 3:20-cv-54).) Even the most cursory of glances at the relevant page of the trust documents would have informed Respondent that no one, including Whiting, could become a trustee without board action, either before or after a vacancy occurred on ARD's board. The three lines above and the three lines below Whiting's listing as a potential successor trustee literally collar his name with references to necessary board action. (*See* Doc. 86, at 189 in Case No. 3:20-cv-54.) Indeed, most of the ink on the page that contains these provisions is devoted to explaining the process for how to fill the vacancy—whether

50

existing or anticipated—*if* the Board chooses to do so.  (*See id.*)  At all points, there is no

question that action is required, and nothing is automatic.

At his deposition in this proceeding, Respondent described his assessment of the trust

document as follows:

> I did not read through all of the trust documents.  My client told me that he was a
> trustee and that was good enough.  And he showed me the page where it said,
> When these people die, I'm a trustee.  And one of them had died, so I was good
> with that.

(Doc. 110, at 60.)  But there is not a single suggestion in the trust document that the succession

of a trustee takes place automatically when a vacancy occurs.  To believe Respondent's version

of events, one must choose to accept that he read none of the substantive language of the page

and, instead, focused exclusively on the fact that Whiting's name was printed on blank lines

provided on the page—lines that are scarcely more than an inch from language that undermines

Respondent's assertions.  And one must choose to believe this despite the context of the litigation

that was occurring.  The defendants specifically discussed this portion of the documents before

trial.  (*See, e.g.*, Doc. 169, at 2–3 in Case No. 3:20-cv-54.)  Further, Magistrate Judge Poplin

cited the trust documents in an order and stated that "the legal documents for ARD . . . show that

Plaintiff Glenn Whiting is not a trustee of that entity."  (Doc. 112, at 30 in Case No. 3:20-cv-54.)

Finally, one must ignore Respondent's scolding of the defendants for not reading the page

closely enough because, according to him, if they had, they would have seen that Whiting's rise

to trustee happened "immediately," "by operation of the trust formation documents," and without

the need for board action.  (Doc. 147, at 11-12, 15 in Case No. 3:20-cv-54.)  But Respondent's

prior pronouncements do not create language in the trust document that was never there, as he

finally admitted in this proceeding.  (*See* Doc. 99, at 4-6 (acknowledging it was "incorrect" to

assert that Whiting was a trustee or beneficiary).)  He finally acknowledged as much because there is no way to read the trust documents and come to a different conclusion.

Third, as the evidence stands, the Court finds it extremely difficult to credit Respondent's very general assertion that he relied on client representations that Whiting was a trustee or beneficiary.[54]  Respondent has produced virtually no evidence of the particulars of such statements.  (*See* Doc. 99, at 7.)  He offers virtually no substance of any of the conversations with Whiting that served as the basis for Respondent's alleged belief.  (*See* Doc. 110.)  He offers no substance of any factual investigation into the matter.  (*See, e.g.*, Doc. 81-1, at 5; Doc. 110, at 49–50.)  His factual assertions about what he discussed with Whiting are exceedingly vague, seemingly intentionally so.  He claims that his investigation consisted of discussions with Whiting and other trustees about topics including "the history of the trust at issue"; "the building owned by the trust"; "the client's acts managing said building"; and "the conversations client had with the former trustee about client taking over."[55]  (Doc. 81-1, at 5.)  None of these claimed topics of conversation meets the issue at hand:  whether Whiting was ever installed as a trustee, an issue directly tied to what kind of damages, if any, he could recover at trial.  Furthermore, given how contentious the beneficiary/trustee issue was at the time, it is extremely unlikely that

---

[54] Respondent contends that he relied on the representations of Whiting in response to all six of the factual allegations in the amended show-cause order.  (*See* Doc. 99, at 4–6.)  Respondent does not disclose what representations he relied upon.

[55] Respondent also claims that the ARD trustees "identified the other trustees."  (*See* Doc. 110, at 80.)  The Court can only assume that Respondent is attempting to suggest that each trustee he spoke to named the other trustee(s), but that is not clear.  Giving Respondent the benefit of the doubt, the Court presumes Respondent is attempting to offer evidence that he spoke with at least one other trustee who identified Whiting as a trustee.  This is a very generous interpretation of Respondent's assertion.

any lawyer would not have bothered to get to the bottom of Whiting's exact status as the issue first arose much earlier in 2021. So, if Whiting had been a trustee, there is little doubt Respondent would have discovered it no later than the spring or summer of 2021. This is the time when a competent attorney would have had a serious conversation with his client about Whiting's status. And, tellingly, after the defendants in *Trew* argued that Whiting was not a *trustee*, Respondent's initial reaction was to draft a declaration for Whiting that he was a *beneficiary*. (*See* Doc. 98-1.) That is not the action of a lawyer who actually has reason to believe Whiting was trustee.

Fourth, Respondent affirmatively represented to the Court that he had evidence of Whiting's beneficiary status and that he would present it to the Court. In briefing his motion for a protective order, Respondent stated:

> Mr. Whiting is a beneficiary of the ARD Properties trust. Plaintiffs must, and will, provide evidence supporting this fact. Production of this evidence has been withheld pending this Court's ruling on the instant motion and cross motion.

(*See* Doc. 78, at 5–6 in Case No. 3:20-cv-54.) And, at trial, Respondent stated that Whiting's wife would testify that Whiting was a beneficiary. (Doc. 94, at 7.) Yet, Respondent never offered any such evidence. (*See* Doc. 227, at 11–12 in Case No. 3:20-cv-54.) Respondent's claimed failure to fully read the trust documents does not explain why he never presented the evidence he purportedly held that demonstrated Whiting's beneficiary status. It is much more likely that he had never cultivated any such evidence.

Last, Respondent has shown a propensity to lie to the Court. He has also shown that he does not take these proceedings seriously. As the facts and analysis in Sections II.B and III.B of this Order clearly demonstrate, Respondent misrepresented several facts to the Court in other instances and made misstatements under the penalty of perjury in discovery documents.

53

Respondent also attempted to mislead the Court as to the importance of the inaccurate representations in *Trew*. (*See supra* Note 49.) He behaves in a manner that no reasonable attorney would dare even consider.[56] This strongly suggests that the Court should lend little credibility to his account of events.

### iii. Evidence of Respondent's Lack of Knowledge

Despite the evidence described above, the Court will not, on a clear-and-convincing-evidence standard, conclude that Respondent knowingly misrepresented facts concerning Whiting's status with ARD in *Trew*. While the evidence outlined above forcefully discredits Respondent's account, other evidence points to Respondent's incompetence as the reason for his misrepresentations to the Court.

Respondent's failure to use ARD's correct legal name until the defendants did so suggests that Respondent did not closely read even the first page of the trust document. (*See* Doc. 119, at 1; Doc. 86, at 186 in Case No. 3:20-cv-54.) ARD's proper name was immaterial to the legal issues of *Trew*, meaning Respondent had no incentive to knowingly misrepresent ARD's name to the Court. Accordingly, Respondent's use of an incorrect name—despite the fact that the correct name is listed in bold on the first page of the trust documents (*see* Doc. 86, at 186 in Case No. 3:20-cv-54)—suggests Respondent did not read the documents, at least in the beginning.[57]

---

[56] Sections II.B and II.C of this Order are littered with examples displaying Respondent's inappropriate behavior.

[57] Given the foregoing discussion, to say that the Court is affording the Respondent the benefit of the doubt would be a great understatement. The truth is that there is no reason to believe any lawyer—even Respondent—would not have read the trust documents once Whiting's status became such a contentious issue in *Trew*.

54

Additionally, Respondent's use of the term "executor" for Whiting in the complaint and amended complaints (*see* Doc. 1, at 2; Doc. 56, at 2; Doc. 159, at 2 in Case No. 3:20-cv-54), when it does not appear anywhere in the trust documents (*see* Doc. 86, at 186–95 in Case No. 3:20-cv-54), suggests Respondent did not read the trust documents. As the Sixth Circuit observed, it is unclear what the term even means in the context of these documents. (*See* Doc. 50-2, at 2 n.2 in 6th Cir. Case No. 22-5448.)

Respondent's inconsistency regarding Whiting's status also arguably fits with his contention that he was entirely unaware of Whiting's actual relationship with ARD—even if it also suggests Respondent knowingly misrepresented Whiting's status—as Respondent appears to have simply claimed Whiting was a "beneficiary" or "trustee" as needed without knowing whether such assertions were true. Respondent's shifting positions indicate that he used whatever designation that best furthered his arguments in the moment. Respondent initially deemed Whiting an "executor." (*See* Doc. 1, at 2 in Case No. 3:20-cv-54.) Respondent did not represent that Whiting was a beneficiary or trustee in *Trew* until the defendants put Whiting's status at issue. (*See supra* Section II.A.) In fact, Respondent fought aggressively against discovery into such facts. Whiting "invoked the Fifth Amendment and refused to answer deposition questions about his sources of income, tax returns, employment, and the composition and relationship with any trust at issue." (Doc. 44, at 19 in Case No. 3:20-cv-54.) Respondent moved for a protective order, which the Court denied. (*See id.* at 20.) Instead of complying with the Court's decision, Respondent filed an amended complaint,[58] in which he claimed to excise

---

[58] Even this amended complaint continued to identify Whiting as the "executor" of the trust, not a beneficiary or a trustee. (*See* Doc. 56, at 2 in Case No. 3:20-cv-54.)

references to a certain damage theory and argued that, in the absence of this damage theory, discovery into the trust was unwarranted. (*See* Doc. 61 in Case No. 3:20-cv-54.) When, as a result, another discovery dispute arose, Respondent—for the very first time—asserted that Whiting was a beneficiary of the trust, citing no evidentiary support. (*See* Doc. 78, at 5 in Case No. 3:20-cv-54 ("Mr. Whiting is a beneficiary of the ARD Properties trust.").) Magistrate Judge Poplin summarized Respondent's position as follows:

> With respect to the ownership of the Pope Avenue Building, Plaintiffs state that Plaintiff ARD Properties owns it and that Plaintiff ARD Properties is a trust controlled by the Whiting and Ammerman families. Plaintiffs state that Connie Ammerman is the trustee for ARD Properties and that Defendants already have documents reflecting such. They further state that Plaintiff Whiting is a beneficiary of the ARD Properties trust and that Plaintiffs will provide evidence supporting this fact.

(Doc. 112, at 11 in Case No. 3:20-cv-54.) At this point in the summer of 2021, Respondent had made no claim that Whiting was a trustee. Even a draft declaration Respondent presented to Whiting (never filed) had Whiting claiming to be a "beneficiary" and a "manager," but not a "trustee"; the declaration identified only Whiting's wife as a trustee. (Doc. 98-1, at 5.) By September, Respondent in fact filed a comparable declaration, with important changes: Whiting identified himself as a "trustee" instead of a "beneficiary;" he did not mention his wife as a trustee; and he asserted that, as a longstanding trustee, he had "authorized all legal work performed on this litigation and all documents filed on behalf of ARD." (Doc. 149, at 2 in Case No. 3:20-cv-54.) Respondent classified Whiting as an "executor" (Doc. 1, at 2; Doc. 56, at 2 in Case No. 3:20-cv-54) until he needed Whiting to be a "beneficiary," (Doc. 78, at 5 in Case No. 3:20-cv-54) and as a "beneficiary" until he needed him to be a "trustee." (Doc. 147, at 11–12, 15

56

in Case No. 3:20-cv-54.)  Such plasticity—along with the dearth of any particular evidence of due diligence—suggests only reactive evidence creation, without any tether to the facts.[59]

Further, while there is ample evidence to discredit Respondent's account, there is no direct evidence that demonstrates that Respondent subjectively had knowledge of Whiting's relationship with ARD.  Having witnessed Respondent's approach to the practice of law for some time, the Court cannot confidently conclude that Respondent knew that his representations in *Trew* were wrong absent such affirmative evidence.  But there is no doubt whatsoever that Respondent utterly failed to investigate the facts:  he admits he didn't read the trust documents, and even his assertions about factual investigation suggest only the most superficial of inquiries.

While the evidence supports a finding that Respondent knowingly misled the Court, the Court chooses to exercise its discretion to find only that the evidence clearly and convincingly establishes that Respondent did not adequately investigate the facts in *Trew*.  This choice is based on Respondent's own admissions, his changing positions as to Whiting's designation, his lack of knowledge as to ARD's legal name, Respondent's past behavior, and his general approach to the practice of law, as the Court has directly observed.

### iv.  *Inadequate Investigation*

Respondent's inadequate investigation in *Trew*—identified in factual allegations 1–4 and 6 of the amended show-cause order—violates TRPCs 1.1, 1.3, 3.1, and 8.4(d).  His discovery

---

[59] Respondent has demonstrated a willingness to make allegations absent any diligence or knowledge of their accuracy in other instances.  For example, in *Athens*, Respondent was willing to name over thirty defendants in the complaint prior to verifying whether they were even present at the event that gave rise to the suit.  (*See* Doc. 279, at 15 in Case No. 3:23-cv-2.)

57

response in this proceeding provides more specificity than anything else he has offered to date concerning what due diligence he performed prior to filing Whiting's declaration:

> . . . Respondent discussed with his client the history of the trust at issue, the building owned by the trust, the client's acts managing said building, the conversations client had with the former trustee about client taking over, and identified other trustees [sic]. Had Respondent or client known about the requirement for a vote at that time, the Respondent and client could have fulfilled any and all further requirements to make client the actual trustee at that time. In other words, this entire issue is much ado about nothing. This is a family trust and literally everyone in the family was in agreement that client take over as trustee. Everyone with a say in choosing a trustee agreed and assumed that client was the new trustee.

(*See* Doc. 81-1, at 5.) These very general statements accomplish nothing toward establishing that Respondent adequately inquired into and analyzed the factual and legal elements of the trustee/beneficiary issue. Talk about the trust's property, how Whiting cared for that property, and past conversations about how Whiting would eventually take over brought Respondent no closer to knowing whether the trust's board took the necessary action to make Whiting a trustee or whether he was ever a beneficiary. That is not surprising, because, as an initial matter, Respondent has admitted that he did not read the relevant portion of the trust documents. (*See* Doc. 7, at 7; Doc. 110, at 49–50.) As a result, he asserts that he did not understand that installing Whiting as a trustee required board action. In these circumstances, it is no wonder that he failed to ask questions about whether Whiting had actually been installed as a trustee or made a beneficiary. Respondent had such an absence of understanding of the issue that he was incapable of engaging in the factual inquiries that would have allowed him to perform an intelligent legal analysis any court would presume he had completed prior to making the representations at hand.

Yet he was willing to lead the Court to believe that—whatever actions were necessary— Whiting had, in fact, been made a trustee. And, despite no basis in the trust documents, he led

58

the Court to believe that Whiting was a beneficiary. As a result, Respondent offered inaccurate representations to the Court in the instances identified by Factual Allegations Nos. 1–4 and 6 (Doc. 91, at 2–4).[60]

Respondent's lack of investigative effort violates TRPCs 1.1, 1.3, 3.1, and 8.4(d). In *King v. Whitmer*, the Sixth Circuit found that the plaintiffs failed to adequately inquire as to the facts supporting their claims when their "own exhibits [] refuted rather than supported" their claims. *See* 71 F.4th 511, 522 (6th Cir. 2023). The court also found that "an adequate prefiling inquiry under Rule 11 includes reading every document one plans to file." *Id.* (citing *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278, 1281 (3d Cir. 1994)). The Court finds this reasoning helpful to the interpretation of the TRPCs at issue here, as they require an objectively reasonable inquiry into the facts supporting a contention just as Rule 11 does. *See* Ann. Mod. Rules Prof. Cond. *Meritorious Claims and Contentions* § 3.1; Fed. R. Civ. P. 11(b). A reasonable inquiry in Respondent's circumstance would have included a thorough reading of ARD's trust documents. *Cf. Garr*, 22 F.3d at 1281 (explaining that the court was "at a total loss to understand how attorneys can urge that they have made a reasonable inquiry into the facts and the law of a case when their complaint is predicated on . . . statements in documents which they have not bothered to read"). A reasonable inquiry would have also included some verification of Whiting's

_____

[60] The Court notes that Factual Allegation 4 is distinguishable from the others listed because Respondent did not make the inaccurate representation himself. However, Respondent's failure to adequately investigate the facts surrounding Whiting's relationship with ARD led to Whiting's inaccurate testimony, as Respondent would have known that Whiting was not a trustee when Whiting testified to the contrary. Further, the issue would have likely been decided before trial had Respondent conducted a reasonable investigation and provided accurate information to the Court. Thus, the Court finds that Respondent's role in offering Whiting's inaccurate testimony renders any distinction immaterial to the Court's analysis.

59

beneficiary status, rather than claimed blind reliance on Whiting's and Connie Ammerman's conclusory assertions. To the extent Respondent relied on such representations, it was entirely unreasonable in this circumstance. *Cf. Blue v. U.S. Dep't of Army*, 914 F.2d 525, 543 (4th Cir. 1990) ("[C]ounsel cannot simply rely on a client's patently incredible testimony when any reasonable investigation of the factual bases for the client's claims or examination of materials obtained in discovery would reveal the paucity and implausibility of the evidence."). Essentially, Respondent was aware of and had possession of ARD's trust documents during most (or possibly all) of the litigation in *Trew*, and despite the consistent relevance of the trust documents (with the defendants and Respondent citing the documents in briefing and the Court referring to them in orders), Respondent inaccurately represented their contents and his client's relationship with ARD because he did not thoroughly read the documents until presented with them at trial.[61] Additionally, Respondent neglected to investigate whether Whiting was a beneficiary and whether there was any competent evidence demonstrating this. These shortcomings constitute clear violations of TRPCs 1.1, 1.3, 3.1, and 8.4(d).

## v. *Misrepresentations after Trew*

While most of the factual allegations in the Court's show-cause order address Respondent's conduct within *Trew*, the fifth factual allegation concerns a representation made after *Trew* concluded. (*See* Doc. 91, at 3.) The Court has chosen to conclude that Respondent

---

[61] Again, the Court notes that Respondent sent Whiting a draft declaration calling for Whiting to aver that he was a trustee for ARD the *same day* he filed a response to the defendants' motion for summary judgment. (*See* Doc. 147 in Case No. 3:20-cv-54; Doc. 98-4.) This by no means suggests the existence of a reasonable inquiry into whether Whiting was in fact a trustee. Respondent has offered no substance as to how he arrived at the language of the declaration, other than the intentionally vague and general assertions discussed above.

60

did not knowingly misrepresent facts to the Court while *Trew* was ongoing, but the circumstances surrounding the fifth factual allegation are different. When Respondent stated that ARD's trust documents provided "that Whiting would become a trustee upon the death of any of the then-current trustees," *Trew* had concluded. (*See* Doc. 91, at 6 in Case No. 3:23-cv-2; Doc. 236 in Case No. 3:20-cv-54.) The Court had discerned Whiting's relationship to ARD, and the language of the trust documents clearly established that Whiting was not automatically appointed as an acting trustee after the death of a current trustee. (*See* Doc. 86, at 189; Doc. 227, at 6–12 in Case No. 3:20-cv-54.) Thus, Respondent was no doubt aware of Whiting's relationship to ARD at the time he represented that the trust documents stated that "Whiting would become a trustee upon the death of any of the then-current trustees." (Doc. 91, at 6 in Case No. 3:23-cv-2.) This description of the trust documents was incorrect, as confirmed by Respondent's decision not to make any contrary arguments on appeal. (*See* Doc. 86, at 189; Doc. 227, at 6–12 in Case No. 3:20-cv-54; Doc. 50-2, at 1 n.1 in 6th Cir. Case No. 22-5448.) As such, and in consideration of the significant evidence of deception discussed above, there is clear and convincing evidence that Respondent violated TRPC 3.3(a)(1) by making this representation to the Court. The Court recognizes that, given the context of this misrepresentation (*see supra* Note 21), it is of less importance than the other alleged misrepresentations, but nonetheless, it still breaches TRPC 3.3.[62]

---

[62] This violation of TRPC 3.3 inherently runs afoul of TRPCs 8.4(c) and (d).

61

### vi. *Conclusion*

Consistent with the findings and analysis above, the Court finds, by clear and convincing evidence, that Respondent violated TRPCs 1.1, 1.3, 3.1, and 8.4(d) in the instances identified in Factual Allegations Nos. 1–4 and 6 in its amended show-cause order (*see* Doc. 91, at 2–3). The Court declines to conclude that Respondent knowingly misrepresented facts in these instances. The Court finds, by clear and convincing evidence, that Respondent knowingly misrepresented the contents of ARD's trust documents to the Court as asserted in Factual Allegation No. 5, in violation of TRPCs 3.3, 8.4(c), and 8.4(d). The Court will discuss the appropriate discipline for Respondent's misconduct in Section V of this Order.

### B. RESPONDENT'S MISCONDUCT IN *ATHENS*

### i. *Response to Show-Cause Order*

In the order initiating this matter, the Court ordered Respondent to show cause why he should not be disciplined for drafting Whiting's response to the defendants' motions for summary judgment in *Athens* (Doc. 186 in Case No. 3:23-cv-2) after withdrawing as counsel. (*See* Doc. 1, at 3.) In response, and consistent with his misrepresentation to the Sixth Circuit (*see supra* Section II.B.iii; Doc. 16-1 in 6th Cir. Case No. 23-6082), Respondent suggested that Whiting could have drafted the response in opposition to the motions for summary judgment using the "tens of thousands of pages of work product" he shared with Whiting during the time he represented him. (*See* Doc. 7, at 15–16.) He asserted:

> Respondent has represented Mr. Whiting and his family members for over a decade. [footnote omitted] That representation includes dozens of matters in state and federal civil courts, criminal courts, administrative proceedings, contract drafting, and other matters. Respondent recorded well over one thousand hours representing Whiting before Judge McDonough alone. Respondent has provided Whiting with hundreds of legal documents drafted by the Respondent. This represents literally tens of thousands of pages of work product, shared with

62

Whiting over the years. Many of those shared documents were in Word format. Often Respondent would send draft documents to Whiting for his review and modification, to be returned to Respondent for final drafting. *This includes documents setting forth precedents and arguments regarding every issue put forth by Mr. Whiting in his accused document.* This also include[es] draft responses to an early motion to dismiss filed by the defendants in the 3:23-cv-002 case.

(*See id.* (emphasis in original).) Respondent persisted in this assertion (*see* Doc. 41, at 9–10) until he provided responses to Pope's written discovery. In those responses, Respondent stated:

. . . Respondent states that he started working on a response to defendant Sliger's motion for summary judgment filed in the *fall of 2023*. That motion raised most of the issues that would be raised by all defendants. Respondent had a draft completed before the end of 2023 that addressed most of the issues. That draft was forwarded to client on February 13, 2024, as part of the documents client had a right to possess as work product. It is respondent's understanding that client took that draft as a template and worked with another individual to respond to the other defendants' motions for summary judgment.[63]

(Doc. 81-1, at 12–13 (emphasis added).) The problem with these assertions is twofold: first, Sliger did not file for summary judgment until *March 25, 2024*, more than a month after Respondent's withdrawal (*see* Doc. 162 in Case No. 3:23-cv-2), and, second, the rest of Respondent's chronology regarding Whiting's response at summary judgment is an outright misrepresentation, as clearly confirmed in the above-described emails and drafts Respondent sent to Whiting. (*See supra* Section II.B.) Respondent offered this account under the penalty of perjury (*see* Doc. 81-1, at 13) and stood by it in his first amended response to the Court's show-cause order (*see* Doc. 86, at 7).

---

[63] Respondent confirmed this account in his deposition, stating that he "had started drafting . . . an opposition to a motion for summary judgment" before he withdrew and sent it to Whiting. (Doc. 110, at 183–84; *see also id.* at 226–27, 266.)

63

Respondent changed his story again after the Court issued the amended show-cause order (Doc. 91). He now retreats to a claim that he lacks "personal knowledge sufficient to admit or deny" whether he prepared these filings for Whiting in *Athens* after he withdrew from representation.[64] (*See* Doc. 99, at 6.) This response does not comply with the Court's Local Rules, and the Court has deemed these allegations admitted after it warned Respondent that it would do so if he failed to admit or deny them as required. (*See* Doc. 104.) Given the clear and convincing evidence establishing his unethical conduct, the Court does not need to rely on these admissions to reach its decision.

### ii. Ghostwriting

"Ghostwriting" occurs when an attorney helps draft pleadings for a pro se party and such assistance remains undisclosed. *See* Lindsay E. Hogan, *The Ethics of Ghostwriting: The American Bar Association's Formal Opinion 07-446 and Its Effect on Ghostwriting Practices in the American Legal Community*, 21 Geo. J. Legal Ethics 765, 765–66 (2008) ("Ghostwriting is the practice whereby an attorney drafts court documents for a pro se litigant, but the court papers do not reveal that the attorney assisted in the document preparation."). Various state ethics committees and courts have reached differing conclusions on the ethics of ghostwriting. *See Undisclosed Legal Assistance To Pro Se Litigants*, ABA Formal Op. 07-446 ("State and local ethics committees have reached divergent conclusions on this topic."); *In re Smith*, No. 12-11603, 2013 WL 1092059 at *14–21 (outlining different views on ghostwriting). The ABA has

---

[64] Respondent was given three opportunities to tell the truth regarding his actions in *Athens*. Rather than capitalizing on this and owning up to his mistakes, he persisted in conduct consistent with what led to this proceeding in the first place.

64

found that "there is no prohibition in the Model Rules of Professional Conduct against undisclosed assistance to pro se litigants, as long as the lawyer does not do so in a manner that violates rules that otherwise would apply to the lawyer's conduct."[65] ABA Formal Op. 07-446. However, most federal courts have condemned the practice more generally. *See Smith*, 2013 WL 1092059 at *14–16 (providing a brief overview of different federal courts' positions on ghostwriting); *In re Schuchardt*, No. 3:18-MC-39-PLR-HBG, 2019 WL 8016697 (E.D. Tenn. Aug. 30, 2019), *report and recommendation adopted*, No. 3:18-MC-39, 2019 WL 6716992 (E.D. Tenn. Dec. 10, 2019) (finding that an attorney's ghostwriting of bankruptcy forms violated TRPC 8.4(c)); *Duran v. Carris*, 238 F.3d 1268, 1272–73 (10th Cir. 2001) (condemning ghostwriting and collecting cases); *Middlebrooks v. City of Macon-Bibb Cnty.*, No. 5:23-CV-00083-TES, 2024 WL 555884, at *3 (M.D. Ga. Feb. 12, 2024), *aff'd*, No. 24-10705, 2025 WL 753377 (11th Cir. Mar. 10, 2025) (expressing its concerns associated with ghostwriting); *Senatus v. Lopez*, No. 20-60818-CV, 2021 WL 5310591, at *2 (S.D. Fla. Aug. 19, 2021), *report and recommendation adopted*, No. 20-60818-CV, 2021 WL 5299867 (S.D. Fla. Nov. 15, 2021) ("An attorney ghostwriting for a pro se litigant is improper because it affords the litigant the benefit of the court's liberal construction of pro se pleadings while also shielding the attorney from responsibility for his counsel."); *Gutierrez v. City of Carson*, No. LACV1007627JAKCWX, 2012 WL 13005846, at *4 (C.D. Cal. Sept. 14, 2012) (condemning ghostwriting); *Ostevoll v. Ostevoll*, No. C-1-99-961, 2000 WL 1611123, at *9 (S.D. Ohio Aug. 16, 2000) (condemning ghostwriting); *Nolt v. Knowles*, No. 3:20-CV-00962, 2022 WL 22895859, at *1 (M.D. Tenn. Dec.

---

[65] This is quite different than the case before the Court.

5, 2022) (expressing concerns about ghostwriting). These courts have generally objected to ghostwriting on the following basis:

> [N]ondisclosure of attorney representation unfairly causes a more lenient standard to be applied to a pro se litigant who is not really pro se, [] it violates the attorney's duty of candor to the court, and [] it violates the attorney's obligations under Rule 11 of the Federal Rules of Civil Procedure to sign pleadings and to certify that the claims and defenses raised in those pleadings are not frivolous.

*Smith*, 2013 WL 1092059 at \*14. The Tennessee Board of Professional Responsibility currently takes no position on the ethics of ghostwriting.[66] See TENN. BD. PRO. RESP., *Formal Ethics Opinions*, https://www.tbpr.org/for-legal-professionals/formal-ethics-opinions, (last visited July 19, 2025).

Here, the evidence clearly and convincingly establishes that Respondent ghostwrote Docs. 173 and 186[67] for Whiting in *Athens*. In addition to the emails plainly evidencing Respondent's actions (*see supra* Section II.B.iii), Whiting's communications with the Court in both *Athens* and the present matter confirm that he could not produce Doc. 173 and Doc. 186 in *Athens* absent Respondent's ghostwriting efforts.[68] Respondent's filings in *Athens*, *Trew*, and

---

[66] The Board had previously held that an attorney "may not engage in extensive undisclosed participation in litigation in behalf of a pro se litigant as doing so permits and enables the false appearance of being without substantial professional assistance." TENN. BD. PRO. RESP., FORMAL ETHICS OPINION 2007-F-153 (2007), https://www.tbpr.org/ethic_opinions/2007-f-153. However, this formal ethics opinion was vacated while the present matter was ongoing.

[67] These documents are addressed in Factual Allegations 7 and 9. (*See* Doc. 91, at 4.)

[68] For example, in Whiting's deposition taken for the present matter, Pope presented Whiting with his "Omnibus Response in Opposition to Defendants' Motions For Summary Judgment," or Doc. 186 in 3:23-cv-2. (*See* Doc. 109, at 232.) Pope asked Whiting if he knew "what the word 'omnibus' means." (*See id.*) Whiting explained that "It's basically a response – your legal response to a motion that they filed for the summary judgment. So it's basically giving my reasons why I don't think it should be granted." (*Id.*) When used as an adjective, Merriam-Webster defines "omnibus" as "of, relating to, or providing for many things at once" or

Case Nos. 3:23-cv-220 and 3:23-cv-221 are strikingly similar to Whiting's response to the defendants' motions for summary judgment in *Athens*. (*See* Doc. 61, at 6–8 (comparing the response in *Athens* to Respondent's other filings).) As such, the evidence clearly and convincingly demonstrates that Respondent ghostwrote Doc. 173 and Doc. 186 in *Athens*.

The Court need not adopt any particular approach to ghostwriting, as it finds that Respondent's ghostwriting of Docs. 173 and 186 in *Athens* violates TRPC 8.4(c) under any standard. ABA Formal Opinion 07-446—which takes a more lenient approach to ghostwriting than those adopted by most federal courts—states that "[w]hether it is dishonest for the lawyer to provide undisclosed assistance to a pro se litigant turns on whether the court would be misled by failure to disclose such assistance." The ABA explains that "there is no prohibition in the Model Rules of Professional Conduct against undisclosed assistance to pro se litigants, as long as the lawyer does not do so in a manner that violates rules that otherwise would apply to the lawyer's conduct." *Id.* Here, Respondent's ghostwriting efforts took place after he noisily and pointedly represented that he was no longer acting as Whiting's attorney, which means such efforts were tied to a misrepresentation to the Court.[69] (*See supra* Section II.B.) Further, Whiting represented that he was proceeding pro se in every filing that Respondent helped prepare, including those he ghostwrote. (*See* Doc. 148, at 1, 9; Doc. 173, at 1; Doc. 174, at 2; Doc. 175, at 2–3; Doc. 186, at

_____

"containing or including many items." *Omnibus*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/omnibus, (last visited July 19, 2025). Whiting did not even comprehend the title of the motion he acted as though he drafted and prepared on his own.

[69] The goal, consistent with Respondent's standards of practice and his contempt for the authority of this Court (and others) seems to have been to continue to conduct litigation, but to conduct it free of the ethical standards Respondent had already demonstrated he could not satisfy.

67

16–17.)  The Court was certainly misled as to Whiting's pro se status.  Thus, even under the

ABA's approach, Respondent's ghostwriting violated TRPC 8.4(c).[70]

Respondent's ghostwriting is analogous to that seen in *Smith* and *Schuchardt*.  In *Smith*,

the court found an attorney violated TRPC 8.4(c) when she ghostwrote bankruptcy forms that

represented that the "Debtor is not represented by counsel."  2013 WL 1092059 at *18.  In

*Schuchardt*, the court found that an attorney violated TRPC 8.4(c) when he ghostwrote

bankruptcy forms because (1) he did so in violation of an agreed order, and (2) he "checked

boxes" on some of the forms that stated the filers were not represented by counsel.  2019 WL

8016697 at *16.  Here, the filings Respondent ghostwrote for Whiting stated that he was not

represented by counsel and Respondent drafted these documents for Whiting after withdrawing

his representation and making representations about discontinuing work for Whiting on the case.

(*See* Doc. 129; Doc. 173, at 1; Doc. 186, at 16–17 in Case No. 3:23-cv-2.)  Such behavior is

analogous to the unethical actions in *Smith* and *Schuchardt*, and the Court finds that these cases

further solidify that Respondent violated TRPC 8.4(c) by ghostwriting for Whiting.

### iii.  Misrepresentations and Fraudulent Conduct

Even if ghostwriting, without more, were an acceptable practice before this Court,

Respondent's deception of the Court violated ethical standards.  In the amended show-cause

order, the Court observed that Respondent's suspected misconduct in *Athens* implicated TRPCs

1.2, 3.3, and 8.4.  (*See* Doc. 91, at 4–5.)  These rules establish the following:

> **TRPC 1.2(d)**: A lawyer shall not counsel a client to engage, or assist a client, in
> conduct that the lawyer knows or reasonably should know is criminal or

---

[70] While the ABA's opinion applies Model Rule 8.4(c) and not TRPC 8.4(c), the Court finds that the identical language of the rules renders this distinction immaterial here.

fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning, or application of the law.

**TRPC 3.3(a)(1)**: A lawyer shall not knowingly make a false statement of fact or law to a tribunal.

**TRPC 3.3(e)**: If a lawyer knows that the lawyer's client intends to perpetrate a fraud upon the tribunal or otherwise commit an offense against the administration of justice in connection with the proceeding, including improper conduct toward a juror or a member of the jury pool, or comes to know, prior to the conclusion of the proceeding, that the client has, during the course of the lawyer's representation, perpetrated such a crime or fraud, the lawyer shall advise the client to refrain from, or to disclose or otherwise rectify, the crime or fraud and shall discuss with the client the consequences of the client's failure to do so.

**TRPC 8.4(c)**: It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

**TRPC 8.4(d)**: It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

Comment 10 to TRPC 1.2 provides that "a lawyer is required to avoid assisting [a] client [in conduct that the lawyer should reasonably know is fraudulent], for example, *by drafting or delivering documents* that the lawyer *knows are fraudulent . . . .*" (emphasis added). TRPC 3.3(e) prohibits similar conduct, as it states "[i]f a lawyer knows that the lawyer's client intends to perpetrate a fraud upon the tribunal or otherwise commit an offense against the administration of justice in connection with the proceeding . . . the lawyer shall advise the client to refrain from . . . the crime or fraud . . . ." TRPC 1.0(d) defines "Fraud" or "fraudulent" as denoting:

> [A]n intentionally false or misleading statement of material fact, an intentional omission from a statement of fact of such additional information as would be necessary to make the statements made not materially misleading, and such other *conduct by a person intended to deceive a person or tribunal with respect to a material issue in a proceeding* or other matter.

(emphasis added). TRPC 3.3(a) prohibits a lawyer from knowingly making a false statement of fact or law to a court. *See Smith*, 2013 WL 1092059 at *14 ("TRPC 3.3(a)(1) states that a lawyer

69

shall not knowingly make a false statement of fact or law to a tribunal.")  Comment 3 to TRPC 3.3 explains that "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."  TRPC 8.4(c) also prohibits an attorney from lying to the Court.  *See* Ann. Mod. Rules Prof. Cond. *Misconduct* § 8.4 (explaining that Model "Rule 8.4(c) is also implicated when a lawyer misleads or lies to a tribunal").  Further, "[c]onduct that is deceitful can violate [TRPC] 8.4(d)."  *See id.* (discussing Model Rule 8.4(d)).

The Court finds by clear and convincing evidence that Respondent's efforts to assist Whiting in *Athens* after he withdrew from representation, assured the Court that he was no longer engaged by Whiting on the matter, and represented that Whiting would proceed pro se violate TRPCs 1.2(d), 3.3(a), 3.3(e), 8.4(c), and 8.4(d).

Respondent represented to the Court that he would no longer act as Whiting's attorney in *Athens* and continued to offer legal assistance to Whiting after making this representation.  In his second motion to withdraw, Respondent stated that Whiting informed him "that as long as [the undersigned] is presiding over [*Athens*], Whiting will not engage [Respondent] to represent him in this matter."  (*See* Doc. 129, at 1–2 in Case No. 3:23-cv-2.)  He also stated that Whiting intended "to proceed with [the] litigation pro se."  (*Id.* at 2.)  Finally, Respondent and Whiting requested that the Court grant the motion and "allow [Respondent] to withdraw from representation of plaintiff Whiting in [Athens]."  (*Id.*)  Thus, Respondent's motion to withdraw and the statements contained therein represented to the Court that Respondent would no longer act on Whiting's behalf or assist Whiting in the suit if the motion was granted.  But Respondent's

70

communications with Whiting after withdrawal demonstrate that Respondent did just that.[71]  (*See supra* Section II.B.iii.)

Accordingly, Respondent affirmatively misrepresented to the Court that he would no longer represent Whiting in *Athens* in violation of TRPCs 3.3(a), 8.4(c), and 8.4(d).

Respondent's conduct after he made this misrepresentation to the Court violates TRPCs 1.2(d), 3.3(e), 8.4(c), and 8.4(d).  The filings Whiting prepared with Respondent's assistance were "fraudulent" under TRPC 1.0(d), as they were intended to deceive the Court and opposing parties by representing that Whiting prepared them pro se.  In Doc. 148 in *Athens*, Whiting represented that he "let [Respondent] go" and signed it as a pro se party.  (*See* Doc. 148, at 1, 9 in Case No. 3:23-cv-2.)  In Doc. 173, Whiting represented that he was proceeding pro se.  (*See* Doc. 173, at 1 in Case No. 3:23-cv-2.)  In Doc. 174, Whiting signed the filing as a pro se party. (*See* Doc. 174, at 2 in Case No. 3:23-cv-2.)  In Doc. 175, Whiting represented that Respondent had ceased acting as Whiting's attorney in the matter and signed the filing as a pro se party.  (*See* Doc. 175, at 2–3 in Case No. 3:23-cv-2.)  Finally, in Doc. 186, Whiting classified himself as a pro se plaintiff.  (*See* Doc. 186, at 16–17 in Case No. 3:23-cv-2.)  Respondent helped Whiting prepare all of these filings.  (*See supra* Section II.B.iii.)  They were meant to mislead the court and opposing parties as to Whiting's pro se status.  Whiting's pro se status was material to the proceedings in *Athens*, as Courts often apply more lenient standards to pro se litigants than represented parties.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed pro se is to be liberally construed . . . ." (internal quotations omitted)) (citation omitted); *Elliott v. Warden,*

_____

[71] And he knew he needed to conceal his work from the Court in order to avoid being caught in the lie.  (*See* Doc. 98-14, at 2 (informing Whiting that the work needed to be in his words).)

*Dayton Corr. Inst.*, No. 24-3766, 2025 WL 692351, at *3 (6th Cir. Jan. 23, 2025) (stating that pro

se pleadings are to be construed liberally) (citation omitted); *Christenberry v. White*, No. 20-

6349, 2021 WL 5983815, at *2 (6th Cir. July 2, 2021) (concluding that a pro se party should not

"'be held to the high standards to which members of the bar aspire or should aspire'") (quoting

*WSM, Inc. v. Tenn. Sales Co.*, 709 F.2d 1084, 1088 (6th Cir. 1983)); TRPC 1.0(o) (defining

"material" as "something that a reasonable person would consider important in assessing or

determining how to act in a matter"); *see also Smith*, 2013 WL 1092059 at *22 (finding that

"attorney participation in the preparation of a bankruptcy proceeding is a material fact"). Indeed,

Respondent helped draft a document that Whiting filed which argued that Whiting's adversaries'

position was "absurd" and was "only done because [Whiting] is Pro Se."[72] (Doc. 175, at 1 in

Case No. 3:23-cv-2.) Respondent actively participated in this fraudulent conduct and did not

counsel Whiting to refrain from such conduct in violation of TRPCs 1.2(d), 3.3(e), 8.4(c), and

8.4(d).

### iv.  *Conclusion*

Consistent with the analysis and findings above, the Court finds by clear and convincing

evidence that Respondent violated TRPC 8.4(c) by ghostwriting Whiting's motion in limine

(Doc. 173 in Case No. 3:23-cv-2) and Whiting's response to the defendants' motions for

summary judgment (Doc. 186 in Case No. 3:23-cv-2) in *Athens* as asserted in Factual Allegations

7 and 9 (Doc. 91, at 4).[73] The Court also finds by clear and convincing evidence that

--------------------------------

[72] The evidence does not clearly show who inserted this language. For the purposes of this decision, the Court will assume that Whiting, not Respondent, did so.

[73] The Court notes that this conduct could also be a violation of TRPCs 1.2(d), 3.3(a)(1), and 8.4(d). However, the Court finds that ghostwriting is most directly addressed by TRPC 8.4(c).

Respondent's misrepresentations concerning his withdrawal in *Athens* violated TRPCs 3.3(a)(1), 8.4(c), and 8.4(d) as asserted in Factual Allegations 7–11 (*id.* at 4–5). Respondent's efforts to assist Whiting after these misrepresentations violated TRPCs 1.2(d), 3.3(e), 8.4(c), and 8.4(d) as asserted in Factual Allegations 7–11.

## IV.     DISCIPLINE

To determine the appropriate discipline for Respondent's misconduct, the Court will consider mitigating factors, aggravating factors, and previous disciplinary action taken by this Court. *See In re Justice*, No. 1:11-MC-3, 2012 WL 2374677, at *29–30 (E.D. Tenn. June 22, 2012), *aff'd*, 525 F. App'x 291 (6th Cir. 2013) (considering such factors when determining appropriate discipline for misconduct).

### A.     Mitigating Factors

Respondent has acknowledged under oath that his conduct in *Trew* was possibly negligent. (S*ee* Doc. 110, at 113.) He also now admits that the information he offered to the Court in *Trew* was inaccurate. (*See* Doc. 99, at 4–6.) Outside of these concessions, Respondent has not mitigated the effects of his conduct or acknowledged his wrongdoing in any way. Although these modest gestures came only after Respondent was confronted with compelling evidence of his misconduct, the Court recognizes the possibility of a very slight improvement in Respondent's attitude toward his ethical obligations. These gestures are not, however, as meaningful as an honest acceptance of responsibility and sincere remorse.

---

*See Schuchardt*, 2019 WL 8016697 at *16 (applying TRPC 8.4(c) when considering the ethical implications of an attorney's ghostwriting).

73

Additionally, although Respondent presented no such evidence, it is the Court's impression that he has never had the benefit of a meaningful professional mentor in private practice. (Doc. 110, at 18 (confirming Respondent has been a solo practitioner since entering private practice).) This lack of exposure to more experienced attorneys' guidance and enlightenment concerning courts' authority and the importance of respect and trustworthiness has likely resulted in Respondent's deficient approach to the practice of law. This lack of mentorship cannot excuse Respondent's conduct, but it might provide a partial explanation for it.

### B.    Aggravating Factors

Respondent's ethical violations are serious. Ultimately, such behavior destroys the Court's ability to trust attorneys. Fair and aggressive advocacy that is so critical to our system of justice can best exist only when the Court is rightly confident in the attorneys' dedication to the principle that they must endeavor to never mislead the Court. The breach of this fundamental underpinning of our adversarial system creates great inefficiencies, as demonstrated herein, as the Court is forced to doubt and inquire when it should be able to simply trust in the honor and professionalism of counsel. Our system would slow to a crawl—if it could function at all—if every lawyer behaved as Respondent has behaved.

Furthermore, Respondent's behavior during the pendency of the present matter shows that he did not take the proceedings seriously. During this proceeding,[74] Respondent:

- Made further misrepresentations to this Court (*see supra* Section II.C);

- Baselessly demanded discovery directly from the undersigned (*see* Docs. 20, 30);

_____

[74] This list is not exhaustive.

74

- Refused to follow the rules of this Court (*see* Docs. 7, 82, 86, 91, 99, 104);

- Violated the orders of this Court (*see* Doc. 82; Doc. 91; Doc. 104, at 3);

- Avoided and prolonged discovery (*see* Doc. 82);

- Moved to have the undersigned sanction himself under Rule 11 (*see* Doc. 34); and

- Accused the undersigned of "adulterating the trial court record" in another matter (*see* Doc. 12, at 2).

In other proceedings, Respondent:

- Moved the Sixth Circuit to stay this disciplinary proceeding and to appoint a special master to "investigate the record-keeping and judge assignment [procedures]" in this Court (*see* Doc. 7-1, at 3 in 6th Cir. Case No. 24-5918); and

- Sued the Sixth Circuit's Clerk of Court and other employees for their work on an appeal of the undersigned's decision in an unrelated case, accusing them of, among other things, using "burner phones" (*see* Doc. 1 in E.D. Tenn. Case No. 3:25-cv-63).

Such behavior is consistent with Respondent's unprofessional approach and attitude toward the courts that necessitated this proceeding in the first place. Respondent has been afforded every opportunity to climb out of the ethical hole his prior behavior created (*see supra* Note 64); instead, he spent the pendency of this proceeding digging even deeper. He deserves significant and meaningful disciplinary sanctions.

### C.  Previous Disciplinary Matters in this Court

Respondent's misconduct is unprecedented in this District. In *Schuchardt*, an attorney was suspended from practice for two years after ghostwriting bankruptcy forms. *See* 2019 WL 8016697, at *16, *22. Here, Respondent ghostwrote more substantive documents for his ostensibly pro se client in *Athens*, and he also knowingly misrepresented other material facts to the Court. (*See supra* Sections II.B, III.B.) Further, Respondent committed several additional

75

ethical violations in *Trew*, which wasted significant resources of the Court, a jury, and other parties.  (*See supra* Section III.A.)

In *Moncier*, an attorney was suspended five years (with an additional two-year probationary period) after threating to abandon a client and disobeying a judge's order.  *See* 550 F. Supp. 2d. at 805, 812–13.  Much like in the present case, the attorney in *Moncier* "bombard[ed] the Court with frivolous motions and filings . . ., disobeyed [orders] of [the] Court, [submitted false information], and place[d] an unnecessary burden on the Court's time and resources."  *See id.* at 811.  However, a review of the record in *Moncier* (Case No. 1:08-mc-9) shows that Respondent's behavior in this matter exceeded that seen in *Moncier* and that Respondent committed more ethical violations.  *See* 550 F. Supp. 2d.at 800–05.

In *Justice*, the offending attorney was suspended for six months after he submitted a false fee petition.  *See* 2012 WL 2374677 at *29, *31.  Like Respondent, the attorney showed no remorse or meaningful acceptance of responsibility.[75]  *See id.* at *30.  However, again,

---

[75] An attorney's acceptance of responsibility is an important factor in determining the appropriate discipline for misconduct.  *See Matter of Cottingham*, 423 P.3d 818, 829 (2018) (explaining that the presumptive sanction in the state of Washington "for intentionally obstructing a disciplinary proceeding is disbarment"); *see also Bd. of Pro. Resp., Wyoming State Bar v. Pearce*, 467 P.3d 158, 165 (Wyo. 2020) (citing cases in Oregon and Washington in which attorneys were disbarred for their efforts to thwart or disrupt disciplinary proceedings).  In *In re Bell*, the Court only issued a public reprimand and ordered the offending attorney to offer ten ethics lectures after he knowingly made a false statement of fact to a court and failed to conduct a reasonable inquiry as to the basis for his assertions.  *See* 713 F.Supp.2d 717, at 721–22.  Notably, the attorney "exhibited heartfelt and genuine remorse" for his conduct.  *See id.* at 723–24.  An attorney's willingness to acknowledge his mistakes demonstrates that he understands the obligations and privileges that come with membership in the bar.  *See Snyder*, 472 U.S. at 644.  Further, such acceptance preserves the Court's time and resources when it takes appropriate action to address an attorney's mistakes.

76

Respondent's ethical violations are of greater quantity and of more serious quality those committed by the attorney in *Justice*. *See* 2012 WL 2374677 at *21.

### D. Sanctions Against Respondent

After considering the relevant factors listed above, the Court hereby **SUSPENDS** Respondent from any practice of law in this District for **five years with a two-year probationary period to follow**.[76] Prior to the commencement of Respondent's probationary period, Respondent must apply for re-admission to practice before this Court, and such application must meet any requirements outlined by the Court's Local Rules and this Order. *See* E.D. Tenn. L.R. 83.7(l). Respondent's re-admission is contingent upon such application. *See id.* ("Reinstatement shall be had only upon a petition by the disciplined member.") Following the Court's written confirmation that Respondent's submission is an adequate application, his probationary period will commence. During the probationary period, Respondent **SHALL** only be permitted to practice before this Court if he is supervised by an attorney appointed or approved by the Court. Respondent may submit his application for re-admission following the first three years of his suspension. However, if the Court grants Respondent's early application, the remainder of his original period of suspension will be added to his probationary period.

Respondent is **ASSESSED** the costs incurred by the Court in this proceeding, including attorneys' fees paid to Patrick, Beard, Schulman, and Jacoway, PC, court-reporting costs,

---

[76] Although Respondent's conduct was more egregious than that addressed in *Moncier*, the Court finds that discipline of equal severity will suffice "to protect the public[,] . . . the integrity and standards of the [C]ourt[,] . . . to correct the unethical and unprofessional behavior of Respondent[,] . . . and . . . to deter other members of the bar of this court from similar unethical and unprofessional conduct." 550 F. Supp. 2d at 810.

77

amounts paid to outside vendors, and any other costs borne by the Court. A subsequent order will detail these costs. Respondent's liability for attorney's fees in *Athens*, Case No. 3:23-cv-220, and Case No. 3:23-cv-221 (*see* Doc. 279 in Case No. 3:23-cv-2; Doc. 57 in Case No. 3:23-cv-220; Doc. 44 in Case No. 3:23-cv-221) shall take priority over his liability to the Court in this matter.

Respondent is **ORDERED** to draft a letter of apology addressed to each of the following defendants and attorneys in *Athens* and *Trew*:

- Chris Trew;

- Seth Sumner;

- Bo Perkinson;

- Brandon Ainsworth;

- Jameson Sliger;

- Deb Cardin;

- Tom Garland;

- Rod Walker;

- Seth Walker;

- Dan Pilkington;

- Emily Taylor;

- Keith Grant;

- Laura Rufolo;

- Brian Bibb; and

- Mitchell Bryant.

The letter of apology shall respectfully acknowledge the findings herein of Respondent's ethical violations and express remorse for his behavior's impact on the defendants and their attorneys. Respondent shall submit the substance of his draft letter of apology to the Court on or before August 25, 2025, via CM/ECF for pre-approval. The Court retains discretion to approve, disapprove, or require changes to Respondent's draft letter. Once the letter's substance is approved by written order, Respondent shall personally sign each individually addressed copy and ensure that it is promptly delivered to each attorney listed and counsel of record for each defendant listed.

Respondent is **ORDERED** to successfully complete twelve hours of continuing legal education approved by the Tennessee Commission of Continuing Legal Education focused on any or all of the rules of professional conduct that Respondent has violated.

## V.     CONFIDENTIALITY

Now that this proceeding has drawn to a close, the Court finds it appropriate to lift the seal on this matter. The Court finds that Respondent and his client, Glenn Whiting, will not be prejudiced by the publication of any documents produced in this matter. Such material does not appear to pertain to any ongoing litigation and primarily consists of communications relevant to the misconduct addressed in this Order. Further, Respondent and Whiting have offered no valid reasons why such material should be kept confidential.[77] In accordance with the public's strong interest in knowing of attorney misconduct and the deterrent effect of the publication of this

---

[77] As noted above, Respondent has sought to have the record unsealed. (*See* Doc. 13.) Whiting has offered no valid objections to his evidence production on the grounds of privilege and has only produced materials relevant to this proceeding. (*See* Docs. 77, 80, 87, 108.)

decision, the Clerk will be **ORDERED** to unseal this case. However, consistent with the Sixth Circuit's order of July 15, 2025, Documents 112 and 113 shall remained sealed until further order.

## VI.      CONCLUSION

Because the undersigned did not exercise his discretion pursuant to Local Rule 83.7(h) to appoint another judge or judicial officer to issue a recommendation, this Order is effective immediately. Any request to maintain any portion of the record under seal shall be filed by 12:00 PM ET on August 11, 2025. The Clerk is hereby **DIRECTED** to:

- Unseal this matter at 12:00 PM ET on August 12, 2025, with the exception of Documents 112 and 113;

- Once the case is unsealed, provide a certified copy of this Order to the Board of Professional Responsibility of the Supreme Court of Tennessee and the Clerk of the United States Court of Appeals for the Sixth Circuit;

- Immediately provide a copy of this Order to Glenn Whiting by email and United States mail;

- Terminate Respondent as counsel in Case No. 3:25-cv-63 immediately;

- Take all other appropriate action to ensure that Respondent cannot represent clients before this Court; and

- Preserve his ability to file in this matter (Case No. 1:24-dm-7).

    **SO ORDERED.**

                              */s/ Travis R. McDonough*
                              **TRAVIS R. McDONOUGH**
                              **CHIEF UNITED STATES DISTRICT JUDGE**

80